**TRIPOLI COMPANY, Inc., Appellant,**

v.

**WELLA CORPORATION.**

No. 17435.

United States Court of Appeals, Third Circuit.

Argued March 25, 1969.

Reargued March 5, 1970.

Decided April 27, 1970.

Lewis H. Gold, Adelman & Lavine, Philadelphia, Pa., for appellant.

David S. Malis, Malis & Feldman, Philadelphia, Pa., for appellee.

Argued March 25, 1969

Before SEITZ, ALDISERT and STAHL, Circuit Judges.

Reargued March 5, 1970

Before HASTIE, Chief Judge, and FREEDMAN, SEITZ, VAN DUSEN, ALDISERT, ADAMS and GIBBONS, Circuit Judges.

OPINION OF THE COURT

GIBBONS, Circuit Judge.

In this case the district court granted a motion of the defendant-appellee, Wella Corporation, (Wella), for summary

judgment under Rule 56(b), Fed.R.Civ. P., and plaintiff-appellant, Tripoli Company, Inc., (Tripoli), appeals.

Tripoli is a wholesale distributor of beauty and barber supplies to professional beauticians and barbers. Wella is the manufacturer of a line of cosmetics, some fifty in number, including hair dyes and tints, permanent waves, hair conditioners, setting lotions and many similar products. Tripoli was for over thirty years, until the summer of 1967, a wholesale distributor for Wella. About that time Wella learned that Tripoli was engaged not only in wholesale distribution to the trade, but also, under the trade style "The Beauty Cage" in retail sales to consumers. Wella then stopped selling to Tripoli, and this lawsuit followed.

Tripoli's complaint sought an injunction "to require (Wella) to resume sales to plaintiff under standard commercial terms" as well as damages suffered "by reason of the violation by (Wella) of the Clayton and Robinson-Patman Acts." The complaint makes no reference to the Sherman Anti-Trust Act, 15 U.S.C. §§ 1–7 (1964), and the only factual allegation, aside from conclusory statements respecting public injury, and private damage to Tripoli's business and property, is the seventh paragraph:

> After approximately thirty years of the above described business relationship, defendant has refused to sell its products to plaintiff on the ground that plaintiff has from time to time *charged its customers a price lower than that which defendant recommended as the resale price in the relevant market area.* (italics added).

■ That allegation has no relationship to the Clayton Act, 15 U.S.C. §§ 12–27 (1964), or the Robinson-Patman Act, 15 U.S.C. §§ 13 and 13a (1964). Possibly it may be sufficient to charge a violation of Section 1 of the Sherman Anti-Trust Act, even absent any allegation of conspiracy or concert of action, since, by a generous construction one could read the quoted allegation as a charge of maintaining resale prices at the wholesale level without the benefit of a valid fair trade agreement. Compare United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919) with United States v. Parke, Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).[1]

■ The continued vitality of the *Colgate* doctrine, permitting unilateral termination for failure to adhere to suggested resale prices, need not, however, be considered, for Wella categorically denied that resale price maintenance had anything to do with the termination, and Tripoli effectively abandoned that contention.

Wella's answer asserted that the true reason for termination was not resale price maintenance, but rather, the resale to retail customers of Wella products intended for the professional trade. Wella went further; it denied that it recommended resale prices to Tripoli, and alleged that Tripoli was free to sell Wella products at any price it chose.

After Wella's answer was filed, Tripoli pursued extensive discovery. It deposed Thomas, the Wella sales manager responsible for Tripoli's territory; Bishop, Wella's general sales manager; Rosendahl, Wella's vice president in charge of sales; Haas, Wella's treasurer; Furia, Wella's credit manager; and Megerle, Wella's president. Only two of these deponents, Bishop and Haas, were asked any questions about resale prices. Both testified that Tripoli's resale prices were of no interest to them, and the matter was not pursued further. Instead, all the Wella witnesses were examined at length about the reason for termination asserted in its answer; that is, resale to non-professional retail customers. Although Wella sold to wholesale competitors of Tripoli, no depositions were taken of third parties.

We review the history of the discovery proceedings because they make it clear that the resale price maintenance

---

1. Pennsylvania Fair Trade Act, Pa.Stat.Ann. Tit. 73, §§ 7–11 (1960).

contention was abandoned. Unlike horizontal price-fixing arrangements, which are almost certain to be closely guarded secrets, a resale price maintenance program must of necessity have been communicated to Tripoli and to other wholesalers. Thus, we are not dealing with a situation where the proofs necessary to sustain a cause of action are locked in the bosom of the alleged conspirators. No hostile witnesses thicken the plot, for if there was a resale price maintenance program for Wella's fifty products, who better than Tripoli would have that information after thirty years as a distributor. Compare Poller v. Columbia Broadcasting, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Moreover, Tripoli did not move for a postponement of the motion for summary judgment pending further discovery.

Charles Di Puppo, an executive of Tripoli, was also deposed. He was asked to identify certain correspondence, dealing mainly with credit. He declined to do so. Significantly, he denied receipt of an exhibit, addressed to him, D–7, marked for identification in his deposition, which is the only item in the entire record, except for the complaint, which contains any reference to resale prices. This reference is ambiguous, for the letter speaks of "our advertised deals," and its meaning is not explained. The addressee denied receipt of the letter. Whether or not it was received, however, Tripoli certainly had in its own possession sufficient information to come forward with an explanation relating the reference to a resale price maintenance program if such was intended. Except for Mr. Di Puppo's denial of receipt, no reference is made to the exhibit, however, in any deposition or affidavits. Whatever its meaning, it cannot on the record before us be given any evidentiary weight.

In support of its motion for summary judgment, Wella filed affidavits denying that resale pricing was the reason for termination, and asserting that termination was prompted by Tripoli's failure to comply with terms of credit and by its violation of resale restrictions imposed on Wella's products. Tripoli chose to fight on these grounds. The two affidavits which it filed in opposition to the motion for summary judgment deal with credit [2] and with resale to nonprofessional customers. There is no contradiction whatsoever, either in those affidavits or in Mr. Di Puppo's deposition, of Wella's affidavits denying the resale price maintenance allegation.

In these circumstances, summary judgment on the resale price maintenance charge was clearly appropriate. Rule 56(e), Fed.R.Civ.P., as amended in 1963, has laid to rest the rule of Frederick Hart & Co. v. Recordgraph Corp., 169 F.2d 580 (3 Cir. 1948), formerly applicable in this circuit, under which Tripoli's unverified complaint might have been sufficient to raise a fact issue sufficient to defeat summary judgment. Even in an antitrust case a party must now come forward with affidavits setting forth specific facts showing that there is a genuine issue for trial.

What Rule 56(e) does make clear is that a party cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion against him.

\* \* \* \* \* \*

To the extent that petitioner's burden-of-proof argument can be interpreted to suggest that Rule 56(e) should, in effect, be read out of antitrust cases and permit plaintiffs to get to a jury on the basis of the allegations in their complaints, coupled with the hope that something can be developed at trial in the way of evidence to support those allegations, we decline to accept it. While we recognize the importance of preserving litigants' rights to a trial on their claims, we are not prepared to extend those rights to the point of requiring that anyone who files an antitrust complaint setting forth a valid cause of

---

**2.** It is not contended that termination for credit reasons would have any antitrust significance.

action be entitled to a full-dress trial notwithstanding the absence of any significant probative evidence tending to support the complaint.

First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289–290, 88 S.Ct. 1575, 1592–1593, 20 L.Ed.2d 569 (1968).

■ But while it abandoned the price maintenance charge, Tripoli did not abandon the fray. Instead, it adopted Wella's theory of the reason for cancellation. Relying on United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1967), Tripoli contended that Wella's policy of restricting resale of its professional beauty care products to professional beauticians and barbers, after title to those products passed to a wholesaler, is a per se violation of the Sherman Anti-Trust Act, 15 U.S.C. § 1 (1964). No motion was made to amend the complaint, but the district court did, and we do, consider the merits of that contention in the light of the pleadings, depositions on file, and affidavits. Fed.R.Civ.P. 56(c).

■ It is clear that not all restraints in a system of distribution fall into the per se category. United States v. Arnold, Schwinn & Co., *supra.* White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Those condemned in *Schwinn* as per se violations were post-sale restrictions on the territory in which or the retailers to whom a wholesaler could resell. That case does not, as plaintiff proposes, establish as a per se violation every attempt by a manufacturer to restrict the persons to whom a wholesaler may resell any product whatsoever, title to which

has left the manufacturer. Rather, *Schwinn* must be read, as must all antitrust cases, in its factual context. That context is a restraint on the territories in which and retailers to whom a wholesale purchaser may resell a bicycle, a product so simple in use that most ultimate consumers are children. No considerations other than marketing and competition were advanced in *Schwinn* as justifications for the restraint. In that context the Supreme Court held:

> Under the Sherman Act, it is unreasonable *without more* for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it.

United States v. Arnold, Schwinn & Co., *supra,* 388 U.S. at 379, 87 S.Ct. at 1865 (italics added).

■ Here there is more, and the restraints are of a different order. Tripoli does not charge that it or any other Wella distributor is confined, in reselling, to a specific territory. Nor does Tripoli charge that it or any other Wella distributor is confined to reselling to "franchised" beauty or barber shops. The restraint is on a wholesale distributor's reselling products intended for professional application to non-professional retail end users. This restraint must be tested not by a per se rule but by the standard of reasonableness. Chicago Board of Trade v. United States, 246 U. S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918); Standard Oil Co. v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); United States v. Addyston Pipe & Steel Co., 85 F. 271, 282 (6 Cir. 1898), aff'd, 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).[3] By that standard

---

3. We are aware that in United States v. Glaxo Group Ltd., 302 F.Supp. 1 (D.D.C. 1969), a district court read *Schwinn* as imposing a per se rule with respect to every post-sale restraint on alienation regardless of market context or purpose. We are not convinced, however, that the Supreme Court intended, for example, that an automobile manufacturer using wholesale intermediate sellers must permit distribution of automobiles through beauty parlors or barber shops rather than through dealers offering appropriate pre-sale and post-sale service. Other examples can be imagined. We do not believe that in the age of "consumerism" the Supreme Court intended so drastic a reduction of the areas in which a manufacturer may exercise responsibility to the consumer as is suggested in *Glaxo.* The restraint in *Glaxo,* moreover, operates in quite a different market context, since the

Wella made a convincing demonstration on its motion for summary judgment that in view of the nature of its products, the restraint in the market setting was not only reasonable but appropriate in the public interest. Tripoli, in response, came forward with nothing significant.

We consider first the nature of the products. Of some fifty, all but two are packaged in a manner intended for resale to the professional trade. The two products intended for sale to retail customers are hair conditioners, which have the effect of softening hair to make it more manageable. These are sold, through separate channels of distribution, to drug and grocery retailers. Wella's president testified on deposition (and that testimony is uncontradicted) that the chemical formulation of the two hair conditioners sold to retail channels is different from that sold to the professional trade; that the suggested method of application is different; and that the two products are not used for the same purpose. It is also undisputed that the hair conditioners intended for professional use are marketed in boxes containing a supply of smaller units for individual application, with the appropriate instructions and warnings furnished with the box; while the hair conditioners intended for retail sale are individually packaged and labeled, with appropriate instructions and warnings furnished with each application.

Except for the two hair conditioners sold through retail channels of distribution, all other Wella products are sold through wholesalers who resell to the professional beauty and barber trade, and each of those products is packaged with a label:

> For sale to professionals only; sale to any other person is prohibited.

In addition, many of the products are sold with a label containing a warning:

> CAUTION: This product contains ingredients which may cause skin irritation on certain individuals and a preliminary test according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows—to do so may cause blindness.

The latter label is required on many of Wella's products by Section 601(a) of the Federal Food, Drug, & Cosmetic Act of 1938. 21 U.S.C. § 361(a) (1964).

Some Wella products are sold with an instruction sheet containing an instruction:

### HYPERSENSITIVITY AND THE PATCH TEST

> It is a well-known fact that some individuals are allergic to certain foods, drugs or cosmetics including hair coloring. Such persons are considered supersensitive or predisposed. To ascertain whether a person is predisposed to COLOR CHARM, the following standard patch test must be made before each application of COLOR CHARM:

Such an instruction is required for many Wella products by the Color Additive Regulations issued by the Federal Food and Drug Administration. 21 C. F.R. §8.1(u) (1969).

It is undisputed that misuse of many of Wella's products can cause dangerous adverse effects such as blindness, burning or irritation of the scalp or brittleness of the hair. Mr. Di Puppo in his deposition freely acknowledged as much. He also admitted making retail sales to non-professionals, but contended that he did this selectively, by asking the customer how much she knew about use of the product. In his words:

> This is just a policy that I have. In other words, if Mary Jones doesn't know how to use the Wella hair color, which by the way, has directions in it

patents there involved provide protection from inter-brand competition and the addition of the restraint had the added ef-

fect of limiting intra-brand competition. Neither situation is present in the instant case.

how to use it, but if they don't know how to use it, we won't sell it to them.

Because Mr. Di Puppo took it upon himself to make this judgment, Tripoli lost the Wella line, for Wella insists that resale be made only to licensed professional beauticians and barbers.

Pennsylvania has established a system of licensing for beauticians and for barbers. To obtain a license as a beautician one must pass an examination. Pa. Stat.Ann. Tit. 63, §509 (1968). Admission to the examination requires a tenth grade education and the completion of twelve hundred fifty hours of schooling in a registered beauty culture school or a three year apprenticeship. Pa.Stat.Ann. Tit. 63, § 510 (1968). Licensing requirements for barbers are similar. Pa.Stat.Ann. Tit. 63, §§ 552, 553. Even more stringent licensing regulations are imposed on the beauty culture trade by the Health Code of the City of Philadelphia. See Department of Licenses and Inspections, Board of License and Inspection Review v. Weber, 394 Pa. 466, 147 A.2d 326 (1959). Wella has imposed on its wholesale distributors a requirement that their sales of its professional products line be restricted to persons in the licensed category. It states that its motive is the same as that of the licensing authorities, the protection of the public against injury.

■ It may well be that Wella is not as much interested in protecting the public from harm as in protecting itself from potential product liability. See, e. g., Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5 Cir.) cert. denied, 391 U.S. 913, 88 S.Ct. 1806, 20 L. Ed.2d 652 (1968); Newmark v. Gimbel's Incorporated, 54 N.J. 585, 258 A.2d 697 (1969). But whichever motive is dominant, either furnishes a sufficient lawful main purpose, to which the restriction on resale of potentially dangerous products is reasonably ancillary. Even tie-in agreements designed to protect against warranty claims have been held valid. E.g., Susser v. Carvel Corp., 332 F.2d 505, 517 (2 Cir.) cert. granted, 379

U.S. 885, 85 S.Ct. 158, 13 L.Ed.2d 91 (1964), petition for cert. dismissed, 381 U.S. 125, 85 S.Ct. 1364, 14 L.Ed.2d 284 (1965); Pick Mfg. Corp. v. General Motors Corp., 80 F.2d 641 (7 Cir. 1935), aff'd, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 (1936). Resale restrictions imposed for the same purpose have also been sustained. Denison Mattress Factory v. Spring-Air Co., 308 F.2d 403 (5 Cir. 1962).

In an attempt to show that Wella was itself introducing professional products into non-professional consumer hands, Tripoli examined Wella's officers about the two hair conditioners sold through retail outlets. The attempt failed, for the only witness who professed to have any knowledge about formulations, Megerle, testified that the professional and non-professional products, even when bearing the same name, were different formulations; that one was a cream and the other a liquid; that they were not used for the same purpose; and that they were applied differently.

■ Had product identity between the two retail products and two of the fifty professional products been established, however, Tripoli's case would not have been advanced. Certainly the inclusion of these two, in different packages and quantities, with different forms of instruction for use, would not make the resale restriction on the entire professional line unreasonable. Even treating the two hair conditioners separately, the difference in packaging and quantity, and the difference in the manner of calling to the user's attention appropriate instructions for use, would seem ample justification for the resale restriction as to them.

There is no allegation here of any attempt to shelter Wella's products from intra-brand competition among wholesalers calling on the same trade, nor has there been any showing that Wella's products have, by the restraint imposed, been sheltered from competition with other brands. On the contrary, the

record discloses that Wella's distributors to the professional trade compete in the same territory, and that Tripoli itself has always handled competing brands. It is difficult to imagine, therefore, a circumstance in which the restriction on resale to the professional trade could have a meaningful anti-competitive effect. None is suggested in the record.

Moreover, while the point was not made to the lower court, there is a serious question whether Wella could legally permit its wholesaler, Tripoli, to engage in a retail business with the subsidy afforded by a price structure intended to support a sales effort to the professional trade. See Federal Trade Commission v. Fred Meyer, Inc., 390 U.S. 341, 88 S. Ct. 904, 19 L.Ed.2d 1222 (1968); Robinson-Patman Act, 15 U.S.C. §§ 13 and 13a (1964). Such an arrangement might well run afoul of the Federal Trade Commission Trade Practice Conference Rules for the Cosmetic and Toilet Preparations Industry, 16 C.F.R. § 221.1(f) (1970). This would be especially true with respect to the two hair conditioning products sold through retail channels of distribution if, as Tripoli contends on appeal (but did not attempt to show below), these are identical with two professional products.

Summarizing, Tripoli first charged a termination for resale price maintenance, but abandoned that contention and relied on the licensed user restraint as a per se violation. It did nothing to rebut Wella's showing that the licensed user restraint was reasonably ancillary to Wella's lawful purpose of protecting the public from injury and itself from liability. Rule 56(e), Fed.R.Civ.P., requires more. First Nat'l Bank of Arizona v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Lockhart v. Hoenstine, 411 F.2d 455, 459 (3 Cir. 1969).

The judgment of the district court will be affirmed.

FREEDMAN, Circuit Judge (dissenting).

This antitrust case is being decided without trial, on depositions and affidavits. The Supreme Court has warned us in Poller v. Columbia Broadcasting, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed. 2d 458 (1962), that in such cases, where subjective elements of motive and intention have a special relevance, summary judgment should be sparingly employed. One of the reasons for this is that affidavits signed by the litigants or their officials are drawn by their lawyers,[1] and it is only under the pressure of the trial itself, where a party has the opportunity to cross-examine, that disclosure of these subjective elements can be fully achieved. Depositions, while they meet some of the objections to affidavits, are no substitute for the searching pressure of a trial in the presence of the finder of fact who observes demeanor and evaluates credibility.

It is true, of course, that Poller did not create a principle of law excluding antitrust cases from the operation of Rule 56 authorizing summary judgment. It does, however, teach us to be on guard against ignoring the outcroppings of a genuine issue of fact in the record, despite professions in affidavits or even depositions of lawful business motive and justification.

It is also true that we are not dealing here with a giant like the corporation involved in Poller. But the lure of price fixing and of customer selection may be relatively as significant to a small company as it is to a corporate giant, and motives of self-interest may make the search for proof just as difficult.

In this case, although the complaint was inadequately drawn[2] and the pre-

---

1. Thus, the affidavits of defendant's employees, Palumbo, Silvestro, Paraine and Hayman, all were carefully drawn in virtually identical language.

2. I agree, as the majority in effect holds, that we should treat the case as if the complaint had been amended to conform to the substance of the claim as it now

trial proceedings were rather loosely conducted, I believe enough already appears to make summary judgment unjustified for two reasons. (1) There exists a genuine issue of fact on whether defendant terminated the relationship of the parties because plaintiff refused to observe defendant's price fixing policy. (2) The determination whether defendant's admitted restriction of the resale of its products to professional beauticians was either unlawful per se under the rule in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), or unreasonable under the test of the "rule of reason" of Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), cannot adequately be made without further factual information.

**I.**

It is undenied that defendant's general sales manager wrote a letter to the plaintiff on June 21, 1967, which speaks both of price and restrictive policy on resales. This letter was tendered by the defendant itself on depositions in order to contradict plaintiff's claim that plaintiff had received no warning before defendant terminated their relationship. Although plaintiff denied receipt of the letter, this is of no real significance, for the immediate question is not the effect on the plaintiff but rather the conduct of the defendant, and this is its own statement describing its conduct and its purpose. I believe the letter alone is sufficient to forbid the entry of summary judgment for the defendant. It reads as follows:

"We have been advised that you are now operating retail stores in which Wella merchandise is being sold. You will note our packages are marked 'for professional use only' not to be sold retail. We note too that your prices are contrary to our advertised deals.

"I am sure you can appreciate the difficult position you place us in when this type of activity is permitted.

"We would like your cooperation in selling Wella merchandise only to professional registered hairdressers as well as your agreement to honor Wella policies in the distribution of merchandise bearing our name."

It is, of course, not clear beyond doubt what is meant by "advertised deals," but defendant, who seeks summary judgment, has supplied no explanation on the record. On its face, it is enough to establish that defendant complained that the prices plaintiff was charging were contrary to something which the defendant established. This brings the case into the forbidden area of price fixing. Indeed, it seeks the plaintiff's cooperation and agreement to honor the defendant's policies. It is true that this letter seems a stray piece of evidence, but it is not to be expected that intentions of price fixing are to be extensively recorded in documents coming from a defendant in an antitrust case. It is enough that there is even a hint of price fixing, which would create liability per se,[3] to require the case to be tried. Such an issue should not be lost in a summary judgment.

**II.**

The defendant claims that it terminated its relationship with plaintiff not because of a failure to maintain prices, but rather because of refusal to conform to the restriction of the resale of defendant's products to professional beauticians. This restriction is claimed to be justified by the danger of physical harm to non-professional users. In my

appears. This general principle is especially applicable in view of the public interest in the enforcement of the antitrust laws by private suitors.

3. United States v. Parke, Davis & Co., 362 U.S. 29, 43–44, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911).

view, the record is too incomplete and inadequate to eliminate for consideration on a trial the question whether this restriction violates the antitrust law.

It is not enough to say that there is some danger in the use of hair dressings and similar items made by the defendant or to cite damage recoveries against a cosmetic manufacturer.[4] It is by now a truism that individual susceptibilities at times produce injury because of allergic or other reactions to products or materials generally used without ill effect. It is common knowledge that even familiar household drugs in wide use, such as aspirin, can in some cases produce harmful side effects. It would be astonishing if this well known fact would justify a producer's restriction of the ultimate marketing of his products to physicians and druggists.

Here, several of the products of the defendant admittedly present no great danger if used in accordance with instructions. Others present no real danger if the patch test which the defendant suggests is employed. Yet defendant applies to these products its restriction against resale to non-professionals. Indeed, there is even some acknowledgement by the defendant that it prohibits the resale of certain non-dangerous products "out of loyalty to the hairdressers" because its main business is the production of items for the professional beautician.

Moreover, the letter of June 21, 1967, which dealt with both prices and non-professional sales, was admittedly written by the defendant not out of its concern for the safety of the ultimate consumer, but rather as a result of complaints by other distributors and beauticians that plaintiff was selling the products to retailers. It is these complaints which the defendant investigated, and as a result of which it wrote the letter.

The requirement by a producer or manufacturer that the purchaser of his product may not resell it to certain classes of purchasers is by now recognized as a serious restriction on freedom of trade and competition which the antitrust laws are meant to preserve.[5] In some cases such a restriction is deemed illegal per se,[6] and in others the rule of reason applies,[7] requiring a knowledge of all the surrounding circumstances which reveal the practical effect and meaning of the restriction. Even if defendant's claim that it imposed the restriction on resale out of concern for the safety of the consumer were enough to take it out of the per se rule of *Schwinn,* the self-serving statements by lay businessmen of self-evident possibilities of harm are inadequate to prevent a trial of the issue under the rule of reason. We have before us no scientific or other expert testimony describing the nature or extent of the danger to laymen from the use of any of defendant's products, nor of any experience in the use of similar products containing adequate notice or warning. Information of this kind goes to the heart of plaintiff's case. For plaintiff has not claimed that there may be no danger whatever from the use of some of the defendant's products. Its claim instead is that whatever danger there is constitutes a risk which can reasonably be guarded against by labeling or even by

4. Helene Curtis Industries, Inc. v. Pruitt, 385 F.2d 841 (5 Cir. 1967), cert. denied 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1968), cited by defendant, in fact held that the manufacturer of a product which contained a label restricting resale to professional users was not liable to a user who had purchased it.

5. White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

6. United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1866, 18 L.Ed.2d 1249 (1967).

7. Janel Sales Corp. v. Lanvin Parfums, Inc., 396 F.2d 398 (2 Cir.), cert. denied 393 U.S. 938, 89 S.Ct. 303, 21 L.Ed.2d 275 (1968).

individual cautionary advice. The effectiveness of this depends to a large extent, of course, on the nature of the risk and of the means which must be taken to guard against its potential harm.

Summary judgment, of course, is to be granted only after all doubts as to the existence of a genuine issue of a material fact are resolved against the moving party.[8] However meager may be the plaintiff's case, it has called forth from the defendant a defense which, if not subject to a per se rule, must at least fit the requirement of the rule of reason. I fail to see how such a determination can be made at this stage of the case. To me the words of the Supreme Court in White Motor Company v. United States, 372 U.S. 253, 263–264, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963) are applicable here:

"We do not know enough of the economic and business stuff out of which these arrangements emerge to be certain. They may be too dangerous to sanction or they may be allowable protections * * *. We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a 'pernicious effect on competition and lack * * * any redeeming virtue' * * * and therefore should be classified as per se violations of the Sherman Act. * * * We conclude that the summary judgment * * * was improperly employed in this suit. * * * We do not intimate any view on the merits. We only hold that the legality of the * * * limitations should be determined only after a trial."

I would reverse the entry of summary judgment for the defendant and remand the case for trial.

SEITZ and ADAMS, Circuit Judges, join in this dissent.

8. Fortner Enterprises, Inc. v. United States Steel Corp., 394 U.S. 495, 500, 89 S.Ct. 1252, 22 L.Ed.2d 495 (1969); Poller v. Columbia Broadcasting, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Also, Season-All Industries, Inc. v. Turkiye Sise Ve Cam Fabrikalari A.S., 425 F.2d 34 (3 Cir. 1970); Toebelman v. Missouri-Kansas Pipe Line Co., 130 F.2d 1016, 1018 (3 Cir. 1942).