130 N.J. Super. 81 (1974)
325 A.2d 505
CLAIROL INCORPORATED, A DELAWARE CORPORATION, PLAINTIFF,
v.
COSMETICS PLUS, A NEW JERSEY CORPORATION, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided July 26, 1974.
*83 Mr. Albert G. Besser (Messrs. Hannoch, Weisman, Stern & Besser) and Messrs. Gilbert H. Weil and Michael Malkin, of the New York Bar, for plaintiff.
Mr. David L. Ficksman of the New York Bar for defendant (Mr. Henry Gurshman, attorney).
SCHREIBER, J.S.C.
Clairol Incorporated (Clairol), a Delaware corporation, seeks to enjoin defendant Cosmetics Plus, a New Jersey corporation, from selling to retail customers any of plaintiff's products which are intended for the "professional" market. Cosmetics Plus owns and operates two retail stores, one in Kearny, New Jersey, and one in Rutherford, New Jersey, which sell various cosmetics, including those manufactured by Clairol, to the public.
Clairol has been producing various beauty supply items, primarily hair dyes, shampoos, and the like, for many years. Its products fall into two basic categories: hair coloring and hair care. The hair coloring products, partially composed of coal tar, are used to color or remove color from hair. The hair care category consists of products such as shampoos and hair sprays which are not made from coal tar. The Clairol name is used in connection with each of its hair coloring and hair care items. It has registered the name "Clairol" as well as the names of many other of its products as trademarks or trade names. Large sums have been spent to advertise the Clairol retail merchandise. Some $30,000,000 was expended in 1973 and $500,000,000 over the last ten years.
Distribution of the hair coloring and hair care products is channeled through two streams. One is designated retail, where *84 the product is intended for the user at home. This is accomplished either (a) through some 1100 direct wholesalers which in turn resell to retail stores, or (b) by making sales to large chain stores or discount houses such as Two Guys from Harrison or Pathmark. The second stream is directed to the beauty salon industry, which has been designated the "professional" trade. Clairol reaches this user by making sales to (a) wholesale beauty supply distributors, (b) chains of beauty salons, and (c) beauty schools. Clairol's organization is divided into two divisions, retail and professional, to service the respective markets.
Some products sold to the retail and professional trades are identical. Some are sold only for the professional trade and some only for the retail trade. In 1973 retail and professional sales totaled $160,000,000 and $20,000,000, respectively. Broadly speaking, the identical items which are sold for both retail and professional markets may be distinguished between those that are and are not made out of coal tar. The differentiation is significant.
Under N.J.S.A. 24:5-1 no person may distribute or sell a cosmetic which is adulterated, and N.J.S.A. 24:5-11.1 provides that a cosmetic shall be deemed to be adulterated if it contains any poisonous or deleterious substance which may render it injurious to users, provided that this provision shall not apply to coal tar hair dye the label of which bears a legend reading: "Caution  This product contains ingredients which may cause skin irritation on certain individuals and a preliminary test according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows. To do so may cause blindness," and the label must also bear "adequate directions for such preliminary testing." The Federal Food, Drug and Cosmetics Act has identical provisions. 21 U.S.C.A. § 361(a).
Probably the most important coal tar product sold to both the retail and professional trades is Miss Clairol Hair Color Bath, a liquid which is used to dye hair. Clairol has approximately *85 13% of the retail hair coloring market in the United States. The packaging and labeling of the hair coloring for the professional and retail markets differ. The retail bottle carries the precise language required by the statutes. It is packaged individually in a box on which is printed advice to keep the bottle away from heat and light, a caution with respect to skin irritation and a direction to read instructions enclosed in the box. The instructions concern preliminary skin and color tests, a color chart section, and directions on how to apply Miss Clairol. The shelf life is about three years, but this life is reduced sharply if the bottle is removed from the carton. The professional package contains six bottles. The professional bottle does not have the statutory language. Its label refers to the fact that cautionary statements regularly required for sale to nonprofessionals are not included on the bottle label; it refers to the skin test, and warns against use for dyeing eyelashes or eyebrows. The bottle carries the legend, "professional use only." Imprinted on the outside carton are the same cautionary statements that appear on the labels of the individual bottles. The legend on the container also warns against exposure of the bottles to heat or light. Inside the package is one small sheet of paper with warnings concerning hypersensitivity and patch test instructions. If one were to purchase one professional bottle, the buyer would not receive the details on how to apply the patch test, specific instructions on how to apply the product, or color data. In the absence of testing or following the instructions in the retail package, use could lead to allergic reactions, green hair, or other disastrous results, any of which would probably have an adverse impact on Clairol's sales and goodwill. Clairol manufactures 27 colors, five of which are sold only to the professional trade. The remaining 22 are sold to the retail and professional markets. The products are identical.
Some of the other products which are sold to the professional and retail trades come in bottles or containers which *86 are identical except that a legend such as "professional use," "professional package" or "professional use only" appears on that destined for the beauty salon market. In some professional items no individual instructions are included as in the retail package. In some the instructions are the same or adequate for both types of use.
The labeling on products which are sold only to the professional trade varies. In some instances, no language limiting sales to the professional trade appears on the label. Other products which are sold by Clairol only to the professional trade do carry that notation. Some of the items are sold only to the professional market because of expertise needed in application, which the professional beautician could apply more readily and safely.
Within each group, retail and professional, the price charged by Clairol is the same. Thus there is no difference in the price charged to the drug wholesaler who sells to retail stores or to large retail store chains. So, too, the price charged for professional use, whether it be to the beauty supply distributor or a chain of beauty salons or a beauty school, is the same. However, Clairol charges a substantially different price for the identical product earmarked for the retail trade and that for the professional trade. For example, the price for Miss Clairol Hair Color Bath is $11.76 a dozen for the retail market (if the purchase exceeds 35 dozen), whereas the price to the professional outlet is $5.76 a dozen. Clairol does not attempt to fix the prices at which its products are resold, either at the wholesale or the retail level. [Certain factual findings and discussion have been omitted.]
It is with the factual backdrop described above that plaintiff seeks to enjoin defendant from selling Clairol products which it desires be restricted to the professional trade. Plaintiff does not predicate its case on a breach of contract for there is no contractual relationship between the parties. Counsel stated on summation that plaintiff does not rely upon a theory of equitable servitude. Nor are the concepts of inducing *87 a breach of contract, including the conspiratorial fraudulent misrepresentation rationale, available to it or found under the circumstances here.
Plaintiff urges that its cause of action is based in part on N.J.S.A. 56:4-1 which reads as follows:
No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or goodwill of any maker in whose product such merchant, firm or corporation deals, or discriminate against the same by depreciating the value of such products in the public mind, or by misrepresentation as to value or quality, or by price inducement, or by unfair discrimination between buyers, or in any other manner whatsoever, except where such products do not carry any notice prohibiting such practices, and except in the case of a receiver's sale or a sale by a concern going out of business.
By its terms the statute is inapplicable where the products do not carry a notice "prohibiting such practices." Obviously, the statute then would not apply where plaintiff's products carried no notice or where the label simply bore the legend "professional use" or "professional package." The only contention made in this respect by plaintiff was that those items which carried the notation "professional use only" satisfied the notice requirement. Guidance as to the nature of the notice required may be found in the case of Ingersoll v. Goldstein, 84 N.J. Eq. 445 (Ch. 1915). There a notice by a manufacturer of watches forbade a sale under various conditions at a price less than that fixed. The court held that, since the statute was to be strictly construed, the notice was ineffective because it forbade a sale for reasons to which the act had no application. Following that approach, one must readily conclude that here the notice did not clearly and explicitly prohibit the sale of the product to home users. To the public the word "professional" may well not mean what Clairol intended. The notice would have to spell out that the sale of the product other than to certain described persons was prohibited, and it has not met the statutory requirement.
*88 Even if the notice were sufficient plaintiff would be unable to meet the remaining statutory requirements. It relies upon the proscription to "discriminate against the same product by depreciating the value of such products in the public mind * * *." To that end it contends that defendant has discriminated against Clairol's goodwill by depreciating the value of its products in the public mind. But defendant has not advocated that the Clairol product is poor or not as good as a competitive brand. The opinion was voiced by Mr. Shea, Clairol's Vice President, that by not leaving the professional product in the same package, which is true as to Miss Clairol Hair Color Bath but not other items, the goodwill image is adversely affected. This does not establish, and plaintiff has not shown by a fair preponderance of the evidence, that defendant intended to harm or discriminate against Clairol products. The statute does not support plaintiff's cause of action.
There is no doubt but that a manufacturer may create goodwill associated with his business. This may be accomplished in a number of ways  sales and prompt and adequate servicing over a long period of time under identifiable names or trademarks to satisfied customers. Advertising on a broad scale may produce goodwill in a much shorter period of time. In any event, the manufacturer may develop a property interest in that goodwill which is evidenced by the name or trademark placed on the product. When that has occurred, the courts have not hesitated to protect that property interest. In J.B. Liebman & Co., Inc. v. Leibman, 135 N.J. Eq. 288 (Ch. 1944), the court wrote:
The law guards the goodwill of a business and will protect the owner  and the public  against unlawful injury through unfair competition. Williamson Candy Co. v. Ucanco Candy Co., D.C. 3 F. (2d) 156, 158; L. Martin Co. v. L. Martin & Wilckes Co., 75 N.J. Eq. 39, 71 A. 409; affirmed, 75 N.J. Eq. 257; 72 A. 294 ... One who adopts a trade-name for use in his business and builds upon it public goodwill, acquires a property interest in both the trade-name and the good-will which equity will protect. Robert H. Ingersoll & Bros. *89 v. Hahne & Co. (Court of Chancery), 89 N.J. Eq. 332; 108 A. 128. [at 292]
In American Shops, Inc. v. American Fashion, etc., Inc., 13 N.J. Super. 416 (App. Div. 1951), the court made the following comment:
Good-will is an intangible value. As an economic phenomenon it more or less fixes the competitive position of a business in the market; as a matter of accounting and appraisal it is an element of the valuation of a business; legally it represents a pecuniary interest recognized as a property right and, as such, entitled to protection. [at 424]
Chief Justice Weintraub wrote for a unanimous court in Great Atl. & Pacific Tea Co. v. A & P Trucking Corp., 29 N.J. 455 (1959):
There being no competition, the question arises whether plaintiff may nonetheless be granted relief. Defendants do not seriously contend that today equity will act only when the litigants compete for the same customer. Early holdings to that effect, reflected for example in National Grocery Co. v. National Stores, 95 N.J. Eq. 588 (Ch. 1924), affirmed 97 N.J. Eq. 360 (E. & A. 1925), have yielded to a demand for a higher level of commercial morality and to the needs of a changing economy. Huge sums are expended in advertising both the product and the producer. Goodwill is a sensitive asset, particularly vulnerable today by reason of mobility of population and the media of mass communication. [at 457-458]
In Red Devil Tools v. Tip Top Brush, 50 N.J. 563 (1967), Justice Jacobs on behalf of a unanimous court wrote that plaintiff's long and prior use of a trademark in connection with its business gave it certain well recognized common law rights, which included the right to restrain unfair trade practices by a noncompetitor which might endanger the goodwill it had established through many years of advertising and service. Professor Chafee commented in his article, "Equitable Servitudes on Chattels," 41 Harv. L. Rev. 945 (1928):
Each ambitious seller by expensive advertising and a vast network of dealers creates in the public the habit of expecting a well remembered *90 product of supposedly high uniform quality in uniform guise at a uniform price for a uniform quantity. Irregular and unauthorized departures from uniformity in any respect tear this pattern of thought and emotion which has been woven with so much trouble and cost * * *.
The attitude toward legitimate protection of goodwill is evidenced by enforcement of restrictive covenants where the sale of a business is involved. Justice Jacobs, in Solari Industries, Inc. v. Malady, 55 N.J. 571 (1970), noted:
* * * Though noncompetitive agreements were at one time flatly outlawed, it is now well recognized that they do have a proper place and are enforceable under appropriate circumstances. Thus a seller's incidental noncompetitive covenant, which is designed to protect the good will of the business for the buyer, is freely enforceable in the courts. [at 576]
Defendant contends that the manufacturer is only entitled to protection when three requirements are satisfied: (1) there is a palming off of his product as that of another, (2) competition exists between the parties, and (3) deception of the consumer is practiced. No such straitjacket exists. Deception of the consumer alone constitutes a sufficient basis for relief. Whenever goodwill is being or has been damaged without any justification, and in the absence of an equal or superior right, the owner thereof is entitled to relief. The existence of such an action under modern conditions to protect the consumer and the rights and property of persons can no longer be questioned. 2 Callman, Unfair Competition, Trademarks and Monopolies (3 ed. 1968), § 84.2.
That Clairol's goodwill would be subject to injury and harm by permitting defendant to distribute many of the professionally marked merchandise to the public is obvious. Insofar as the coal tar products are concerned  Lady Clairol Hair Color Bath  the sales not only violate the New Jersey and United States laws (N.J.S.A. 24:5-1 et seq. and 21 U.S.C.A. 361(a)), but pose a threat to public health and safety. The absence of the individual instruction sheets *91 may also compound the user's difficulty. Clearly, Clairol's goodwill is at stake. Clairol has successfully obtained injunctive relief in other jurisdictions to protect that goodwill where its professional hair coloring product was being sold to the retail trade. Clairol Inc. v. L.H. Martin Value Center, Inc., 40 N.Y. Misc.2d 875, 244 N.Y.S.2d 210 (Sup. Ct. 1963); Clairol Inc. v. Peekskill Thrift Drug Corp., 141 U.S.P.Q. 147 (N.Y. Sup. Ct. 1964), aff'd p.c. 25 A.D.2d 496, 267 N.Y.S.2d 476 (App. Div. 1966); Clairol Inc. v. Sarann Co., 146 U.S.P.Q. 726 (Pa. C.P. 1965). To the same effect Revlon, Inc. v. Regal Pharmacy, Inc., 29 F.R.D. 169 (E.D. Mich. 1961).
Clairol's goodwill will also be unduly injured with respect to products which it proposes to offer only to the professional trade and not to the public. Some of these require physical dexterity in application (in the absence of which injury  both physical and emotional  may result), or instructions on utilization (in the absence of which untoward consequences may occur). In this group, products sold only to the professional trade, are concentrates bearing the same name but not the same composition as a retail counterpart. To permit the public to buy the concentrate would constitute a fraud and deceit since it is not the same as the one which has been advertised to the public.
The only category where Clairol's goodwill would not be affected is where the professional and retail products and instructions are the same. No justification exists for this dichotomy except Clairol's desire to have two prices to compete with or capture the beauty salon business.
The principle that the owner has a right to protect the goodwill attached to his product is not, as indicated above, unfettered. Courts have historically recognized that restraints on alienation of personalty may be invalid. These two doctrines may conflict, for contractual attempts (as here by Clairol) to restrict the immediate purchaser's resale of its goods unquestionably involve a restraint of trade. It is necessary, *92 therefore, to examine the nature, extent and applicability of the restraint of trade doctrine.
The vice chancellor in Ingersoll v. Goldstein, supra, wrote that, at common law, when chattels were sold "with conditions restricting the sale thereof, the title passes, but the conditions, being against public policy are void." Reliance for that broad proposition was mistakenly placed on Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). There plaintiff, a manufacturer of medicines, sold its products to wholesalers and certain retailers under contracts which fixed the resale price. Defendant, a noncontractual wholesaler, was charged with inducing contract purchasers to violate the minimum prices on sales to the defendant. Chief Justice Hughes held that the retail price fixing was illegal and, after noting that generally a restraint upon alienation is invalid, wrote:
With respect to contracts in restraint of trade, the earlier doctrine of the common law has been substantially modified in adaptation to modern conditions. But the public interest is still the first consideration. To sustain the restraint, it must be found to be reasonable both with respect to the public and to the parties and that it is limited to what is fairly necessary, in the circumstances of the particular case, for the protection of the covenantee. Otherwise restraints of trade are void as against public policy. As was said by this court in Gibbs v. Baltimore Gas Co., 130 U.S. [396] p. 409, 9 S.Ct. 553, 32 L.Ed. 979, "The decision in Mitchel v. Reynolds, 1 P. Wms. 181; S.C., Smith's Leading Cases, 407, 7th Eng. ed.; 8th Am. ed. 756, is the foundation of the rule in relation to the invalidity of contracts in restraint of trade; but as it was made under a condition of things; and a state of society, different from those which now prevail, the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved, and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is, whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is, or is not, unreasonable. Rousillon v. Rousillon, 14 Ch. D. 351; Leather Cloth Co. v. Lorsont, L.R. 9 Eq. 345."
"The true view at the present time," said Lord Macnaghten in Nordenfelt v. Maxim-Nordenfelt &c. Co., 1904, A.C. p. 565, "I think, is this: The public have an interest in every person's carrying on his trade freely: so has the individual. All interference with individual *93 liberty of action in trading, and all restraints of trade of themselves, if there is nothing more, are contrary to public policy, and therefore void. That is the general rule. But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable  reasonable, that is, in reference to the interests of the parties concerned and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favor it is imposed, while at the same time it is in no way injurious to the public." [at 406-407, 31 S.Ct. at 384]
Vice-Chancellor Lane, in Ingersoll & Brother v. Hahne & Co., 89 N.J. Eq. 332 (Ch. 1918), viewed Dr. Miles Medical Co. v. John D. Park & Sons Co. as permitting reasonable restraints of trade. He concluded, in a case involving price fixing by a manufacturer, where it offered to sell the product with no price limit provided the manufacturer's name did not appear, that restrictions upon the resale of an article to protect the manufacturer's goodwill were reasonable and accordingly valid. He wrote:
* * * it is now well settled that restraints which are reasonable in the absence of statute are valid. It is also well recognized that a person has a property interest in his trade-name and goodwill, and will, even in the absence of statute, be protected against injury to that trade name and goodwill. [at 335]

* * * * * * * *
* * * Complainant does not seek to retain any right in the article itself; it merely seeks to restrain the use of its trade-name and goodwill, except under conditions fixed by it. It may permit the purchaser of the article to use its trade name and goodwill under such conditions as it sees fit. It has an interest, in addition to that of mere protection to its trade name and goodwill, for it guarantees the article sold, and scrupulously performs its guarantee, maintaining a large and expensive repair department for this purpose. [at 336-337]
That restraints of trade should not act as an automatic bar where there is reasonable justification for the restrictions became well settled in New Jersey. Irving Investment Corp. v. Gordon, 3 N.J. 217 (1949). The flexibility of the *94 standard and remedy afforded a means to protect the public  and the owner of the goodwill or trade name. The two principles  protection of goodwill and unrestricted alienation of personalty could be substantially accommodated by limiting restraints to those which were fair and reasonable. Cf. Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25 (1971).
In addition to measuring the reasonableness of Clairol's restraints, it is also necessary to test them under the New Jersey Antitrust Act and the Sherman Act. N.J.S.A. 56:9-1 et seq. and 15 U.S.C.A. § 1. Since the New Jersey Antitrust Act must "be construed in harmony with ruling judicial interpretations" of the federal statute, primary consideration must be directed to the federal law. Section 1 of the Sherman Act reads:
Every contract, combination in the form of trust * * * or conspiracy in the restraint of trade or commerce among the several states, or with foreign nations is declared illegal.
In United States v. Topco Associates, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), Mr. Justice Marshall declared:
Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. And the freedom guaranteed each and every business, no matter how small, is the freedom to compete  to assert with vigor, imagination, devotion, and ingenuity whatever economic muscle it can muster. [at 610, 92 S.Ct. at 1135]
Judicial scrutiny of the impact of the Sherman Act must be made in the light of this philosophy. Restraints fall into two categories, horizontal (which involve agreements among competitors) and vertical (which concern agreements between persons of different economic levels, such as the producer and the wholesaler). Horizontal restraints to fix prices or territories have been held to constitute per se violations. *95 United States v. Sealy, Inc., 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967); United States v. Topco Associates, supra.; United States v. Addyston Pipe & Steel Co., 85 F. 271 (6 Cir.1898), aff'd 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899). In the instant case there is a vertical restriction (the producer's attempt to limit the customer to whom the wholesaler may sell). Defendant contends that under the principles enunciated in United States v. Arnold, Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), the Clairol restraints are per se violative of the Sherman Act. Arnold, Schwinn & Company (Schwinn) was charged with violation of section 1 of the Sherman Act because of its methods of distribution. Schwinn manufactured and sold bicycles, parts and accessories. The bicycles were distributed through 22 franchised wholesalers and to some 5,000 to 6,000 franchised retailers. Distributors and retailers were permitted to sell competitive brands. Each franchised dealer was to purchase Schwinn bicycles exclusively from the distributor authorized to serve the particular area in which he was located. The dealers could only sell to consumers and not to unfranchised dealers. The distributors could only sell to franchised Schwinn retailers in their assigned territories. Schwinn's franchising policy was brought about in part by its desire to provide "the best service for Schwinn bicycles" by selecting retailers whom it had found competent to repair and maintain bicycles. The court posed the issue to be whether the distribution and sales restrictions had an impact in the marketplace which illegally restrained trade. It noted that a manufacturer may select its immediate customers without violating the Sherman Act. The court reasoned and concluded that:
* * * Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it. * * * Such restraints are so obviously destructive of competition that their mere existence is enough. If the manufacturer parts with dominion over his product or transfers *96 risk of loss to another, he may not reserve control over its destiny or the conditions of its resale. [at 379, 87 S.Ct. at 1865]

* * * * * * * *
* * * Once the manufacturer has parted with title and risk, he has parted with dominion over the product, and his effort thereafter to restrict territory or persons to whom the product may be transferred  whether by explicit agreement or by silent combination or understanding with his vendee  is a per se violation of Sec. 1 of the Sherman Act. [at 382, 87 S.Ct. at 1867]
Interpretation of the Schwinn case has led to divergent points of view. "Territorial Restrictions and Per Se Rules  A Reevaluation of the Schwinn and Sealy Doctrines," 70 Mich. L. Rev. 616 (January 1972). On the one hand, some courts have applied the principle that any restraints imposed by the manufacturer-seller with respect to the buyer's resale fall within the Schwinn proscription. An example is United States v. Glaxo Group Limited, 302 F. Supp. 1 (D.D.C. 1969). Glaxo and I.C.I., both British corporations, owned certain patents with respect to grisofulvin, an antibiotic. I.C.I. executed a sales contract under which the purchaser was not permitted to resell grisofulvin in bulk without I.C.I.'s permission. I.C.I. required this condition "to ensure uniform standards of health and safety in the preparation of a final product throughout the world." The court held that even though the motive was laudable, the Schwinn principle applied  the restraint on alienation was per se unlawful. The Glaxo interpretation has been followed in Eastex Aviation, Inc. v. Sperry & Hutchinson Co., 367 F. Supp. 868, CCH Trade Reg. Reports #74,854 (E.D. Tex. 1973); Dobbins v. Kawasaki Motors Corp., 362 F. Supp. 54 (D. Or. 1973); United States v. Eaton Yale & Towne, Inc., CCH Trade Reg. Reports #73,889 (D. Conn. 1972). The majority of the commentators adopt this view. B. Bock, Antitrust Issues in Restricting Sales Territories and Outlets (1967); Kittelle, "Territorial and Customer Restrictions Through Consignment or Agency  Schwinn or Sin?", 12 Antitrust Bull. 1007 (1967).
*97 On the other hand, in Tripoli Co. v. Wella Corp., 425 F.2d 932 (3 Cir.1970), cert. den. 400 U.S. 831, 91 S.Ct. 62, 27 L.Ed.2d 62 (1970), Judge Gibbons held for the majority of the court that not all restraints on territory in which or retailers to whom a wholesaler could resell were invalid under the Schwinn holding. Defendant Wella Corp. manufactured some 50 cosmetic items for the professional trade, two of which were also sold to the public consumer through retail outlets. Plaintiff Tripoli Co. had been a wholesale distributor of beauty supplies and a customer of defendant for over 30 years. When Wella Corp. learned that plaintiff had also entered into the retail business and was selling to the retail trade products earmarked for the professional, it refused to sell to plaintiff. Tripoli Co. sued to force defendant to continue offering its products and contended that Wella Corp.'s policy of restricting resale of its professional beauty care products to professional beauticians after title passed constituted a per se violation of the Sherman Antitrust Act. The Circuit Court rejected this conclusion and noted that Schwinn must be read in the legal and factual context of territorial restraints on distributors and restrictions on retailers with respect to a bicycle, a product so simple that most ultimate consumers are children. The court pointed out the following sentence in the Schwinn case with emphasis on two words indicated:
"* * * Under the Sherman Act, it is unreasonable without more for a manufacturer to seek to restrict and confine areas or persons with whom an article may be traded after the manufacturer has parted with dominion over it."
The Circuit Court concluded that here there was more because, among other things, some of the professional bottles did not contain labels required by the Federal Food, Drug & Cosmetic Act of 1938 nor the individual instruction sheets, and that the two retail items were not identical to their professional counterparts. The court pointed out that a restraint to prevent *98 a wholesaler from reselling products to nonprofessional users must be tested by a standard of reasonableness. It rationalized that either protecting the public from harm or the manufacturer from potential product liability was a sufficient lawful purpose to justify the sales restrictions.
The Tripoli interpretation, namely, that the "without more" has substantive significance in a customer restriction matter, was seemingly adopted in Good Investment Promotions, Inc. v. Corning Glass Works, 493 F.2d 891 (6 Cir.1974). There, Corning Glass Works (Corning) had supplied cooking ware to the plaintiff, a trading stamp company, under a contract. When Corning discovered that plaintiff was redeeming stamps issued at supermarkets, to which Corning objected, Corning terminated the contract. Plaintiff charged a violation of the federal antitrust law because Corning was attempting to control the cooking ware after the sale. Plaintiff's motion for summary judgment, granted by the District Court, to the effect that there was a per se violation in accordance with the Schwinn case, was reversed. The Circuit Court ruled that the "without more" had substantive effect. It commented that the record in Schwinn elaborately described the total market interaction and interbrand competition, whereas in the case before it there was no information to the effect that Corning insisted upon observance of customer limitations. The court opined that because of factual disputes a record had to be made, particularly in light of Corning's assertion that everyone, including plaintiff, could continue to buy cooking ware from Corning's distributors without any limitation on resale rights. Cf. Carter-Wallace, Inc. v. United States, 449 F.2d 1374, 196 Ct. Cl. 35 (Ct. Cl. 1971), which the plaintiff also relies upon. Carter-Wallace interpreted Schwinn as being applicable where the vendor attempted to exercise complete control over the vendee's use of the product, but where all purchasers could buy a drug at the same price or certain buyers at a lower price on condition that on resale the drug *99 be used in combination with other drugs, then the per se Schwinn rule would not be pertinent and reasonableness of the restraint would be considered. It is submitted that this reasoning flies in the face of Schwinn  for all that a manufacturer would have to do is set up two price schedules which would result in a market for only one. Schwinn could set a much higher price for bicycles which could be resold to any retailer and a much lower price to franchised dealers. The end result would be exactly what Schwinn sought to do. See LaFortune v. Ebie, 26 Cal. App.3d 72, 102 Cal. Rptr. 588 (Ct. App. 1972), where the Tripoli rationale was used to apply a reasonableness test to a territorial restriction.
Analysis of the language and reasoning in the Schwinn decision in the light of the dissenting opinion casts grave doubt upon the validity of the Tripoli rationale. First, the court's conclusion at the end of the opinion contains no limitation on the doctrine that once the manufacturer has parted with dominion over the product, his effort to restrict "persons to whom the product may be transferred  whether by explicit agreement or by silent combination or understanding with his vendee  is a per se violation of § 1 of the Sherman Act." The words "without more" appear in a sentence in the midst of the discussion and may be deemed to mean simply that nothing more need be shown to establish a violation of the Sherman Act other than the manufacturer's restrictions over "persons with whom an article may be traded after the manufacturer has parted with dominion over it." See discussion in Kugler v. Koscot Interplanetary, Inc., 120 N.J. Super. 216, 245 (Ch. Div. 1972), wherein the court questioned Tripoli's "narrow reading of Schwinn." Second, the Tripoli case holds that protection of the public from harm or the manufacturer from potential product liability serves a sufficient factual basis to distinguish Schwinn. The Tripoli court, in a footnote in which it distinguishes Glaxo, writes that "We are not convinced, however, that the Supreme Court intended, for example, that an automobile *100 manufacturer using wholesale intermediate sellers must permit distribution of automobiles through beauty parlors or barber shops rather than through dealers offering appropriate pre-sale and post-sale service." (425 F.2d at 936). But this issue was before the Schwinn court. Mr. Justice Stewart in his dissenting opinion pointed out that Schwinn developed its franchise system by selecting dealers who could properly service its bicycles. Bicycles, he noted, are in constant need of maintenance. He also commented that the rule adopted by the majority struck down Schwinn's policy of ensuring that franchised dealers not sell to unfranchised retailers, because that would subvert the purpose of the whole distributional scheme, namely, to assure proper service. The relationship between proper servicing of a bicycle and public safety is obvious. Danger to the public, particularly children, in riding an improperly maintained or repaired bicycle may well be substantially greater than if a person utilizes a shampoo which does not have the precise ingredients contemplated or the color of the hair dye is not the same as that expected. The factor of public safety was before the court and one must assume that the majority had given that due consideration.
Plaintiff attempts to distinguish Schwinn, Sealy, Glaxo and Koscot because all are linked to an ultimate impairment of price competition. None of the rationales in those cases concerned the price impact. In Topco the Supreme Court removed any doubt that price fixing was a necessary ingredient. Plaintiff also lays great stress on the fact that the Schwinn opinion approvingly referred to White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). This approval was made only in sanctioning the franchising of distributors and retailers by the manufacturer and in approving control over the goods where the manufacturer has retained ownership. Plaintiff's reliance is misplaced. White Motor Co. can stand for nothing more. As Mr. Justice Stewart noted, by holding the restriction on the *101 franchised dealer not to sell to unfranchised retailers illegal per se, the court had repudiated the White Motor Co. decision. See Bork, "The Rule of Reason and the Per Se Concept," 74 Yale L.J. 775, 778 (1965), where the author predicted the demise of the White Motor Co. case unless the court were to reexamine its approach to restraints of market (other than price) trade.
The language in the Schwinn case, in the light of the Court's pronouncement in Topco, requires that under the Sherman Act vertical restraints imposed by the manufacturer on the buyer must fall. The broad policy enunciated in Schwinn, that the manufacturer, after sale, may not restrict persons to whom the product may be transferred, is not to be frustrated by the manufacturer's motive to protect its goodwill.
Although the manufacturer may not exercise control over the product once it has yielded dominion, title and risk, the purchaser is not justified in thereafter using unlawful means or methods in its distribution and sale. The retail seller is under obligations to the public to disclose material facts, to refrain from misrepresentations, fraud and deceit, and to comply with various statutes, such as the Uniform Securities Law (N.J.S.A. 49:3-47 et seq.) and the Consumer Fraud Act (N.J.S.A. 56:8-1 et seq.). It is clear that the defendant's sale of Clairol's coal tar products in professional containers violates the New Jersey and federal laws. N.J.S.A. 24:5-1 and 21 U.S.C.A. § 361(a). The Lady Clairol Hair Color Bath professional bottles do not bear the appropriate required labels. Defendant's sale thereof violates the federal and state acts. Nor are the directions and instructions which accompany the retail bottle included with each professional counterpart. Further, the warning on the individual bottle carton to keep the bottle in a cool place away from heat and light is missing. Under these circumstances, defendant should not be permitted to sell to the retail trade the professional bottles of Miss Clairol Hair *102 Color Bath. To do otherwise would constitute a fraud on the public by failing to disclose information which the manufacturer has made available for the public's protection and welfare. Accordingly, defendant will be prohibited from selling the professional Miss Clairol Hair Color Bath bottle unless it places upon and affixes to each bottle a suitable label on which is imprinted the language required by the federal and state statutes and unless with each bottle it delivers to the purchaser at the time of the sale a duplicate of the instructions which accompany the retail bottles. In addition, defendant must include with each sale a notice to the effect that the bottle had been produced by Clairol and sold for the professional beauty salon trade; that defendant had inserted its label on the bottle and included an individual instruction sheet; that the life of the contents is shortened by not having been shielded from the light by an individual box, and that the entire procedure was done without plaintiff's approval. In this manner the public will be completely and fully advised as to what has occurred, of the manufacturer's directions and warnings, and to whom it may look for redress in the event of injury or damage. The label, instructions and notice shall be submitted to the court for its approval. Cf. Chanel, Inc. v. Casa Flora Co., 100 N.J. Super. 19 (App. Div. 1968); Clairol, Inc. v. Cody's Cosmetics, Inc., 353 Mass. 385, 231 N.E.2d 912 (Sup. Jud. Ct. 1967). No inference is to be drawn that Clairol's instructions insofar as responsibility to a third person is concerned are adequate. D'Arienzo v. Clairol, 125 N.J. Super. 224 (Law Div. 1973).
Some Clairol products are sold only to the professional trade. Defendant conceded that it should not sell those which require particular skill to apply, in the absence of which damage or injury may occur to the consumer. Another group in the professional only category is comprised of shampoo concentrates. These products have retail counterparts in name which chemically are not the same as the professional package. If the retail user were to follow the instructions on the *103 bottle, she would have no problems. Yet, to permit the retail public to purchase the professional package under the same name would be misleading, since the products are not identical. Accordingly, sales by defendant of these items may only be made if accompanied by an appropriate notice, in which is indicated the difference in the retail counterpart, the fact that Clairol had not sold the concentrate for the general public, and that the sale was being made to the consumer without Clairol's approval. A third group in this category require instructions which are found only in the Clairol Professional Encyclopedia which is made available to beauty salons. To have the public use these ignorant of the color effect or appropriate method of application could well have a deleterious public effect. Here again, defendant must supply a proper notice with each sale, which would include all necessary instructions, the fact that Clairol had not sold the product for public consumption, and that the sale was being made to the consumer without Clairol's approval. A fourth group consists of five shades of Lady Clairol hair colorings. These are sold to hairdressers to afford them a greater number of shades. These coal tar products require the warnings referred to above under the federal and State laws. In addition, instructions for application and use are not affixed to each bottle. The labeling, instructions and notice referred to above for Miss Clairol Hair Color Bath are equally pertinent here. A fifth group in this category consists of items where the instructions on the package are adequate for the consumer as well as the public. In this instance there appears to be no need for a special notice or other literature.
A third category consists of products sold to the retail and professional trades, where the items are identical and where the instructions on the professional bottle or jar are the same as or adequate for the consumer. No sound basis exists for the restriction of goods which fall in this group, and no restraint is warranted against the defendant's sale of these items.