CLAIROL, INCORPORATED *vs.* CODY'S COSMETICS, INCORPORATED.

Essex.   November 7, 1967. — December 7, 1967.

Present: WILKINS, C.J., WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Unfair Competition. Equity Pleading and Practice,* Suit to enjoin unfair competition, Decree.

Where it appeared that a manufacturer of hair dye sold the product to wholesalers for resale at retail to the general public for home use in bottles bearing a descriptive label and each individually packaged in a carton containing a pamphlet of easily understood instructions, and sold the product, at a substantially lower price, to wholesalers for resale to professional hairdressers in bottles bearing a different label and distributed six in a carton called a "six-pack" and containing a

different instruction sheet, and that the proprietor of a discount store purchased "six packs" of the "professional use" bottles at wholesale and sold them individually, unwrapped, at retail for home use at a reduced price, it was held, in a suit in equity by the manufacturer against the store proprietor, based on G. L. c. 110, § 7A, to enjoin such conduct of the defendant as unfair competition, that the plaintiff. was entitled merely to a decree enjoining the defendant from selling the "professional use" bottles unless there was furnished with each bottle a legible, printed statement containing certain warnings against health risks and undesirable results, indicating that the bottle was originally designed for professional use and was being sold without the manufacturer's pamphlet of instructions prepared for home users, and suggesting a "strand test."

BILL IN EQUITY filed in the Superior Court on November 8, 1965.

The suit was heard by *Macaulay*, J.

*Edward B. Hanify* (*Gordon T. Roberts, Thomas G. Dignan, Jr., & Robert F. Hayes* with him) for the plaintiff.

*Albert S. Previte, Jr.*, for the defendant.

CUTTER, J. The plaintiff (Clairol) seeks to enjoin the defendant (Cody's) from selling (in the manner theretofore practised by Cody's) at retail to the general public Clairol's products designated "Professional Use Only." The facts are stated upon the basis of the trial judge's careful, complete, subsidiary findings, which are fully justified by the reported evidence. The case is before us on report without decree. G. L. c. 214, § 31.

Clairol makes fourteen shades of permanent hair dye and also two blue shades which are to be used only in conjunction with one or more of the basic shades. All these products are sold in two "different channels of trade at different prices: one through so-called 'retail jobbers' for ultimate resale through . . . retail establishments to the general public for home use; and the other, through so-called 'beauty supply jobbers', for resale to professional hairdressers . . . and beauty schools."

"The contents of a bottle of . . . dye bearing a particular color number are exactly the same in . . . chemical composition for the . . . 'retail users' as a bottle bearing the same color number sold" for professional use. "The only differ-

ences between the [same size] bottles of the two classes are
. . . the labels."[1]  The retail bottles, however, "are indi-
vidually packaged in cartons and each carton has a pamphlet
of instructions. . . . [P]rofessional use [bottles] are dis-
tributed in . . . cartons containing six bottles [six-packs].
Only one instruction sheet, different . . . from the . . .
pamphlet inserted in retail . . . cartons in that it describes
only the hypersensitivity tests and warnings . . . is placed
in each 'six-pack' carton."

Cody's, "operating a discount store in Lawrence, has been
buying from wholesale outlets . . . six-packs designed
for . . . professional users only and selling the . . . bottles
singly at retail to home users."  Clairol seeks to enjoin this
as unfair competition under G. L. c. 110, § 7A.[2]

Clairol has not taken advantage of the Fair Trade Law
(G. L. c. 93, §§ 14A–14D).[3]  The judge correctly concluded
that the Unfair Sales Act (G. L. c. 93, §§ 14E–14K) is not
applicable upon this record.

Clairol has a substantial good will for its products and
controls thirty per cent of a highly competitive hair dye
market with gross sales of its "hair color bath" of over

---

[1] The pertinent parts of the label on the retail consumer bottle read,
"CREME FORMULA . . . MISS CLAIROL HAIR COLOR BATH . . .
[Number and name of color] CAUTION.  This product contains ingredients
which may cause skin irritation on certain individuals, and a preliminary
test according to accompanying directions should first be made.  This product
must not be used for dyeing the eyelashes or eyebrows; to do so may cause
blindness  Contents 2 Fl. Oz. . . ."  The corresponding part of the label
on the professional use bottle read "PROFESSIONAL USE ONLY WARN-
ING  Cautionary statements regularly required for sale to non-professionals
and instructions essential to the use of this product by non-professionals are
not included on bottle labels.  Non-professional sale may result in prosecu-
tion under federal law.  Use Before . . . [stamped date]  CREME FOR-
MULA . . . MISS CLAIROL HAIR COLOR BATH . . . [Number and
name of color]  CAUTION: Be sure to use the standard PRELIMINARY
PATCH OR SKIN TEST before EVERY APPLICATION (full head or
retouch).  Details of such test may be obtained upon request to Clairol.  This
product MUST NOT be used for dyeing the eyelashes or eyebrows; to do so
may cause blindness. . . ."

[2] Section 7A, inserted by St. 1947, c. 307, reads "Likelihood of injury to
business reputation or of dilution of the distinctive quality of a trade name
or trade-mark shall be a ground for injunctive relief in cases of trade-mark
infringement or unfair competition, notwithstanding the absence of competi-
tion between the parties or of confusion as to the source of goods or services."

[3] The Federal Food, Drug and Cosmetic Act, 21 U. S. C. §§ 361–363, and
related sections (1964), and G. L. c. 94, § 186 (as amended by St. 1961, c. 600,
§ 2, and St. 1963, c. 487, § 1; see fn. 6) apply to such hair color products.

$15,000,000 a year. It spends for advertising more than $5,000,000. Each bottle for home use is distributed in a distinctive yellow carton with which the product has become associated in consumers' minds. Easily understood instructions in the retail pamphlet were prepared to insure consumers of "safe and satisfactory results."[4] Directions are given concerning (a) skin tests for hypersensitivity, (b) strand tests to obtain the desired color, (c) use of gloves during application, (d) the assembly and application of the product, and (e) proper utensils. Seriously undesirable and undesired results may follow failure to comply with the instructions.

Because its product may deteriorate upon exposure to heat or light, Clairol has adopted a standard "shelf life." Each home use carton and professional use bottle bears a stamp, "Use before [a specific date]." Outdated merchandise may be returned to Clairol for full credit. Use of product which has deteriorated may result in an undesired color.

Retail channel sales are made at about seventy-three cents a bottle to Clairol's retail wholesalers (who make about a twenty per cent markup), drug store and certain retail chains, "very large independents," and certain others. Professional use bottles are sold (a) at thirty-nine cents a bottle in six-packs to beauty jobbers who resell to beauty salons at a forty per cent markup, and (b) directly to beauty fairs and beauty schools at thirty-six cents a bottle. Retail sales are more profitable to Clairol than professional sales which are "only marginally profitable." Retail sales, however, are much helped by the professional use of Clairol products. The practice of selling at lower prices for professional use thus "has become a valuable [advertising] factor . . . in inducing" retail purchases.

---

[4] Women are "timid in making a determination to color their hair" because of fear that "it will affect their status, reputation, and appearance." Accordingly, the pamphlet gives assurance "that the results will be glamorous if the instructions are followed." In this connection, a company witness, with somewhat lyrical candor, described Clairol's operations as "the business of selling an image . . . a brand name. We are in the cosmetic business where you sell a hope and a promise and a dream." Consumers obviously pay heavily for the expenses of the advertising needed to create the intangibles thus sold.

In 1963, Clairol abandoned placing each professional use bottle in an individual carton with an instruction pamphlet. The purpose was to save about $200,000 a year and increase profits from the professional sales.[5]

Cody's has sold Clairol hair color bath in unwrapped bottles, bearing the "Professional Use Only" labels but without individual cartons, from bins exposed to a bright store lighting system. With many bottles it distributed a mimeographed instruction sheet. The trial judge found that this mimeographed sheet mentioned essentially the hypersensitivity tests prescribed for hair colorings by the Federal act, but he concluded that it did not "strictly . . . comply with" G. L. c. 94, § 186,[6] as amended by St. 1961, c. 600 § 2. The mimeographed sheet gave no substantial instructions concerning the other matters dealt with in Clairol's retail use instruction booklet. The judge concluded, however, that, because the mimeographed sheet "substantially warned . . . of the danger of the products and . . . to make sensitivity tests," Cody's (in the absence of contract relations with Clairol) was not required to instruct users on other matters. Some Clairol bottles sold by Cody's to

---

[5] The six-pack saves individually packaging six bottles and printing six individual instruction booklets. Individual packaging of the retail bottles, on the other hand, provides an attractive package which protects the bottle from breakage and from light. It also gives Clairol assurance that its retail sales will not be hurt by failure to deliver instructions, the receipt of which may become an important factor in product liability. See *Carter* v. *Yardley & Co. Ltd.* 319 Mass. 92, 96; *Mealey* v. *Super Curline Hair Wave Corp.* 342 Mass. 303, 305. See also *Taylor* v. *Jacobson*, 336 Mass. 709. Clairol was of opinion that licensed hairdressers (see G. L. c. 112, §§ 87T–87KK, as amended) did not need and did not use the instruction sheet.

[6] Section 186, as amended (see fn. 3), provides, in part, that for purposes of §§ 186–195, "an article shall be deemed to be adulterated . . . In the case of a cosmetic: First, if it . . . contains any poisonous or deleterious substance which may render it injurious to users under the conditions of use prescribed in the label thereof, or under such conditions of use as are customary or usual; provided, that this provision shall not apply to coal-tar hair dye, the label of which bears the following legend conspicuously displayed thereon: 'Caution — This product contains ingredients which may cause skin irritation on certain individuals and a preliminary test according to accompanying directions should first be made. This product must not be used for dyeing the eyelashes or eyebrows: to do so may cause blindness', and the label of which bears adequate directions for such preliminary testing. For the purposes of this paragraph the word 'label' shall include all written, printed or graphic matter upon any cosmetic article or any of its containers or wrappers or accompanying such article . . . .'"

private detectives bore use expiration dates earlier than the sale date.

Cody's bought Clairol professional use products at forty-five to fifty cents a bottle from jobbers. It sells about 1,000 bottles a month at seventy-three cents a bottle. Some beauty salons also sell professional use bottles to customers.

There was no evidence of complaints or injuries arising out of Cody's sales. The trial judge took the view, nevertheless, that Cody's sales of professional products "are extremely likely to injure . . . [Clairol's] business reputation . . . or dilute the distinct qualities of its trade name or trade marks." He concluded that Clairol was at fault in failing to exercise sufficient control over its professional product jobbers to prevent sales to discount houses like Cody's and that this fault contributed to Clairol's troubles as much as Cody's retail sales of the easily procurable products.

1. The record, as the trial judge indicated, reveals no unfair competition in the usual sense of passing off the product of another as that of Clairol, or of trade mark infringement, or of taking advantage of name or trade mark similarity to "do some 'free riding' . . . on the plaintiff's business reputation, to the damage of" Clairol's trade mark, as in *Skil Corp.* v. *Barnet,* 337 Mass. 485, 494–495. See *Angell Elevator Lock Co. Inc.* v. *Manning,* 348 Mass. 623, 625–626. There is no confusion of corporate names or trade marks or possibility of such confusion. Cf. *Great Scott Food Mkt. Inc.* v. *Sunderland Wonder Inc.* 348 Mass. 320, 323, 324–325; *Massachusetts Mut. Life Ins. Co.* v. *Massachusetts Life Ins. Co.* 351 Mass. 283, 290–292. The product sold by Cody's was made by Clairol. Although marked "Professional Use Only," it was identical with Clairol's retail product except for the different label placed upon it by Clairol, the uncovered bottle, and the absence of Clairol's instruction pamphlet.

There also is here no breaking open of Clairol's bottle container and changing the chemical content of the liquid. See e.g. *Coca-Cola Co.* v. *Bennett,* 238 Fed. 513, 516–518 (8th Cir.); *Coca-Cola Co.* v. *J. G. Butler & Sons,* 229 Fed. 224,

231–233 (E. D. Ark.) Callmann, Unfair Competition and Trade-Marks (2d ed. and supp.) § 84.2 (c). If there is technical adulteration within the meaning of G. L. c. 94, § 186, as amended (fn. 6), it is because neither the bottle nor Cody's mimeographed sheet (despite its aggregate effect) contains the precise statutory warning.

2. Clairol places principal reliance upon G. L. c. 110, § 7A (fn. 2), in seeking protection against unfair competition by sales of its own products in a manner not intended by it, which it alleges will damage its reputation. Section 7A, by supplementing general equity principles, has encouraged a wider range of relief against allegedly unfair competitive practices than would probably have been granted prior to its enactment. See Michelson, Massachusetts Law of Unfair Competition and Restatement 2d: Torts, 49 Mass. L. Q. 131, 137–139. In each Massachusetts case cited,[7] however, there was some element of possible confusion of (1) a product or trade name of another, or the activity of another, with (2) the product, trade name, or activity of the plaintiff. See note, 68 Harv. L. Rev. 814, 851–852.

We do not suggest that such possible confusion is essential either to general equitable relief or to relief under § 7A, but thus far no authority indicates what other equitable considerations will justify granting injunctive relief under § 7A. Although the precise scope of the section, and of related general principles, can be determined only on a case by case basis, we regard § 7A as authorizing protection of business reputation and trade marks from unfair injury and dilution on a somewhat broader basis than was clearly recognized prior to its enactment. See Callmann, Unfair Competition and Trade-Marks (2d ed. and supp.) §§ 84.2–84.2 (a); note, 77 Harv. L. Rev. 520, 526–532.

---

[7] The earlier cases in the State and Federal courts arising under § 7A were reviewed in *Skil Corp.* v. *Barnet*, 337 Mass. 485, 488–491. See *New England Tel. & Tel. Co.* v. *National Merchandising Corp.* 335 Mass. 658, 665–666. Recent cases are the *Great Scott Food Mkt. Inc.* case, 348 Mass. 320, 322–325, and the *Massachusetts Mut. Life Ins. Co.* case, 351 Mass. 283, 290–292. See *Polaroid Corp.* v. *Polaraid, Inc.* 319 F. 2d 830, 834–837 (7th Cir.); note, 41 Cornell L. Q. 515, 518–519, esp. n. 26.

This case calls upon us to consider whether certain dealings by another in a producer's own first quality merchandise, as labeled by him, constitute unfair competition. We assume that protection against false marketing, by misrepresentation or deceptive sales practices, will justify relief.[8]  Nothing in our cases, however, suggests that first quality merchandise may not be sold under a producer's trade mark in sealed units prepared and labeled by him, at least if disclosure is made of departures (see fn. 8) from the producer's marketing methods or of disadvantages to the consumer possibly resulting from the selling method used.

Clairol must rely largely on cases from other jurisdictions (principally New York and Pennsylvania), which somewhat broadly prevent selling a trade marked product in a manner different from that adopted by the producer. In *Bayer Co. Inc.* v. *Sumner Printing Co.* 7 F. Supp. 740, 742 (N. D. Ohio), aspirin tablets distributed by the producer in larger packages were sold by the defendant in packages of two. The selling method was enjoined as deceptive to the extent that it gave the public the impression that the Bayer Company sponsored that method. The Pennsylvania courts have enjoined hair dye distributions like that now before us. In *Clairol, Inc.* v. *Martin Wholesale Distribs. Inc.* 35 D. & C. 2d (Pa.) 78, 91–92, the risk to Clairol's business reputation was deemed sufficient to require that the professional use bottles be packaged as put out by Clairol and include adequate instructions. The court held, however, that Clairol's

---

[8] See Restatement 2d: Torts (Tent. draft No. 8, 1963), §§ 712–713; Restatement: Torts, §§ 736–737 (not changed in drafts of Restatement 2d); Michelson, op. cit. 49 Mass. L. Q. 131, 140–141.  See also, e.g. *Cheney Bros.* v. *Gimbel Bros. N. Y.* 280 Fed. 746, 748 (S. D. N. Y.); *Jacob Ruppert* v. *Knickerbocker Food Specialty Co. Inc.* 295 Fed. 381, 383–384 (E. D. N. Y.); *Lysol Inc.* v. *Montgomery,* 23 F. 2d 682 (W. D. La. — adulteration); *Burlington Mills Corp.* v. *Roy Fabrics, Inc.* 91 F. Supp. 39, 43–47 (S. D. N. Y. — second quality goods described as first).  A wider range of activity, however, in selling trade marked products is permissible where adequate, nondeceptive information is given to the public concerning the seller's departures from the producer's own marketing methods and dealings with the product.  See *Prestonettes, Inc.* v. *Coty,* 264 U. S. 359, 368–369; *Champion Spark Plug Co.* v. *Sanders,* 156 F. 2d 488, 492 (2d Cir.).  See also *Champ on Spark Plug Co.* v. *Sanders,* 331 U. S. 125, 128–132; *Singer Mfg. Co.* v. *Briley,* 207 F. 2d 519, 521–522 (5th Cir.); *Bulova Watch Co.* v. *Allerton Co.* 328 F. 2d 20, 24 (7th Cir.); *R. B. Semler, Inc.* v. *Kirk,* 27 F. Supp. 630, 632 (E. D. Pa.).

"advertising program is not protectable under the doctrine of unfair competition." In *Clairol, Inc.* v. *Sarann Co. Inc.* 37 D. & C. 2d (Pa.) 433, 452–456, similar relief was granted not only on the basis of unfair competition but also on the ground that the "Professional Use Only" label imposed an implied equitable servitude upon the chattel which bound the defendant.[9] The New York courts, partly on the basis of a New York penal statute and partly on the basis of a New York statute like our § 7A, have also given injunctive relief in like circumstances. *Clairol Inc.* v. *L. H. Martin Value Center, Inc.* 40 Misc. 2d (N. Y.) 875, 876 (Supr. Ct. Spec. Term). See *Clairol Inc.* v. *Peekskill Thrift Drug Corp.* 141 U. S. P. Q. 147 (Supr. Ct.), affd. 25 App. Div. 2d (N. Y.) 496; *Clairol Inc.* v. *Carlton Drug, Inc.* (27 App. Div. 2d [N. Y.] 652). See also *Lanvin Parfums, Inc.* v. *Le Dans, Ltd.* 9 N. Y. 2d 516, 520–523.

3. Clairol presses upon us the potential risks to its business reputation from uninstructed home use of its "Professional Use Only" product. The principal actual injury, however, appears to be the effect upon Clairol's retail sales of Cody's enterprising exploitation of Clairol's dual pricing arrangements by which Cody's makes retail sales at a price essentially that at which Clairol sells the same liquid to its retail wholesalers.

Clairol, it seems to us, largely seeks to protect what has been an effective marketing and advertising device. So far as the risks to the public are concerned, by individual packaging of its professional product,[10] Clairol could protect it-

---

[9] Reliance was placed upon *Waring* v. *W D A S Bdcst. Station, Inc.* 327 Pa. 433, 444–448, and upon the somewhat novel case of *Nadell & Co. Inc.* v. *Grasso,* 175 Cal. App. 2d 420, 426–431. See notes, 9 De Paul L. Rev. 288, 12 Stanford L. Rev. 860, 17 W. & L. L. Rev. 272. The case deals with the disputed question whether equitable servitudes may be imposed on chattels. See also Chafee, Equitable Servitudes on Chattels, 41 Harv. L. Rev. 945, and Equitable Servitudes and Chattels, 69 Harv. L. Rev. 1250. Cf. *Garst* v. *Hall & Lyon Co.* 179 Mass. 588, 590–591; *Independent News Co. Inc.* v. *Williams,* 293 F. 2d 510, 517–518 (3d Cir.).

[10] The difference in cost to Clairol of individual packaging of the professional product at most would be less than a cent for an instruction sheet and about a cent and a half for an individual carton. "Roughly, if professional use bottles were individually packaged . . . the cost would be about two cents" per bottle.

self from most, if not all, the risks (including product liability, fn. 5) to which it contends Cody's conduct exposes it. As the trial judge points out, Clairol could also protect itself by rigid supervision of its professional jobbers.

Clairol's efforts to obtain relief, so far as they involve price protection, deal with a matter as to which Clairol has not seen fit to use the Fair Trade Law. G. L. c. 93, §§ 14A–14D, as amended. Where there has been no compliance with a statute directly dealing with price protection, we perceive no reason for applying c. 110, § 7A, or general equitable principles, to afford such protection. On this record also, we see no basis for treating either (a) Clairol's labels on its "Professional Use" bottles (see fn. 9, *supra*), or (b) any arrangement by Clairol with its jobbers to restrict to professional hairdressers the jobbers' resale of such bottles, as binding in equity upon nonprofessional purchasers from such jobbers who have no direct contractual relationship with Clairol.

4. A more compelling consideration in deciding whether to grant any relief is protection of the public. Doubtless, many purchasers from Cody's were women who had previously used a particular Clairol shade to their satisfaction and were familiar with the instructions and procedures for applying Clairol or competitive hair dyes. Such consumers do not appear to be exposed to substantial risk. They have a legitimate interest in buying the Clairol product as cheaply as possible. Cody's customers, however, may include others who, if unwarned, may be harmed. We also recognize that Clairol's reputation may be injured in the event of any substantial number of poor results arising from use of "Professional Use" Clairol by inexperienced, retail purchasers. Although no necessity appears in this case for broad relief such as was granted in the Pennsylvania and New York cases, some limited protection to inexperienced consumers and to Clairol is justified under general equitable principles and under § 7A. This can be afforded without enjoining Cody's from selling the professional bottles, without making such sales more cumbersome, and without restraint of

trade or injury to the important public interest in buying trade marked commodities at low prices.

Reasonable protection will be given if Cody's is enjoined from selling Clairol professional bottles except when it furnishes with each bottle a legible, printed statement (a) containing the precise statutory warning required by G. L. c. 94, § 186, as amended (fn. 6), and any applicable Federal statutes; (b) indicating that the professional bottle was originally sold by Clairol in six-packs for use by professional hairdressers, that the bottles are being sold by Cody's separately, and (unless Cody's provides such a book) that there is furnished no copy of Clairol's instruction book prepared for nonprofessional, "home use," retail purchasers; (c) warning that, unless consumers consult and follow such instructions, they may incur substantial health risks and, also, results may not be satisfactory, (d) warning that the two blue shades are not safely to be used alone; and (e) suggesting a strand test because the contents of unpackaged professional bottles may produce undesired results if they have been exposed unduly to light or are used after the indicated expiration date. The record shows no justification for more stringent regulation of Cody's sales of professional bottles.

4. The case is remanded to the Superior Court for the entry of a final decree consistent with this opinion.

*So ordered.*