**POLYMER TECHNOLOGY CORPORATION,**
Plaintiff,

v.

**Emile MIMRAN a/k/a Alan Franco, U.D.S. Export & Import a/k/a User Defined Software, Optic Express, Inc., American Contact Lens Association, International Contact Lens Lab I, Martin Powers Sales, Inc., Worldwide Scents, Inc., Julio Moreno, Carlos Sanchez d/b/a Alpha Omega, and Various John Does, Jane Does and XYZ Companies, Defendants.**

No. 91 Civ. 8150 (WK).

United States District Court,
S.D. New York.

Jan. 6, 1994.

---

Morton M. Maneker, Proskauer Rose Goetz & Mendelsohn, New York City, for plaintiff.

Philip E. Roux, Shea & Gould, New York City, for defendant.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, Senior District Judge.

On December 4, 1991, plaintiff Polymer Technology Corporation ("plaintiff"), a manufacturer of contact lens products, filed a complaint alleging trademark infringement, trademark counterfeiting, fraud, false designation of origin and unfair competition against several defendants, including Emile Mimran ("defendant"), who buys, sells and distributes such products and owns several entities, also named in the complaint, which sell such products by mail order and to retail outlets. Plaintiff sought a preliminary injunction against all defendants, contending that they were violating its trademark rights by purchasing from plaintiff's distributors a line of products which it had intended solely to be distributed to doctors. All defendants, except for Mimran and corporations owned by him, and a defendant named Alpha Omega, which defaulted, stipulated to a preliminary injunction. Among the defendants so stipulating was Worldwide Scents ("Worldwide"), a wholesaler of health and beauty products and over the counter drugs, whose president has admitted in a deposition that over the course of two years Worldwide had bought plaintiff's products from defendant Mimran and divided and repackaged those products in its warehouse using counterfeit packaging provided by Alpha Omega. On March 17, 1993, we granted plaintiff's motion for partial summary judgment and a permanent injunction against Worldwide. In a Memorandum and Order dated February 4, 1992, we denied a preliminary injunction against defendant Mimran, finding that plaintiff's failure to have restricted by contract "the population of entities to which defendants could sell its product" defeated its claim that the sales in question were unauthorized. On appeal a divided panel of the Second Circuit vacated our decision and remanded the matter for reconsideration of certain evidence relevant to plaintiff's claim of trademark infringement, *Polymer Tech-*

*nology Corp. v. Mimran* (2d Cir.1992) 975 F.2d 58, 61. Plaintiff now makes a Renewed Motion for a Preliminary Injunction based upon the trademark theories previously advanced as well as several new theories. For the reasons that follow, the motion is denied.

## BACKGROUND

Plaintiff manufactures a range of contact lens and lens care solutions under its registered trademarks, "BOSTON" and "BOSTON ADVANCE." These solutions are marketed through two distinct channels of trade: (1) retail sales; and (2) sales directed through authorized distributors to professional eye care practitioners ("the professional solutions"). According to plaintiff, most users of lens care products remain loyal to the brand initially recommended by their doctor (Pl.Mem. at 8). Therefore, its program of supplying doctors with professional samples to give to their patients is its "most important promotional program" which is "crucial to the success of Polymer's care solutions in the marketplace." *Id.* As of October of 1992, Boston Solutions products dominated the lens care solution market, having 80.5% of the professional market and 74.2% of the retail market (Pl.Ex.6).

In its original motion for a preliminary injunction, plaintiff alleged that defendant was engaged in practices which infringed its trademark rights, claiming that: (1) defendant obtains the professional kits and resells them for retail trade, and (2) defendant breaks down the kits and sells at retail individual bottles of the professional solution. Defendant admitted the first allegation, but denied the second.

## A. The FDA Labelling Requirements

■ Labelling and packaging of retail solutions such as these must receive pre-market approval from the Food and Drug Administration ("FDA") and comply with its

regulations; plaintiff claims that the professional samples are exempt from FDA labelling requirements. The regulations require that labelling for products intended for retail sale include a warning as to sterility, adequate warnings regarding contamination and a tamper-evident seal. *See* 21 C.F.R. §§ 200.50(a)(3), 200.50(b)(2), 211.132(b) (1991). The solutions intended for retail sale are generally sold in individually packaged boxes which contain warnings concerning contamination, contraindications and shelf life, as well as a list of active ingredients and preservatives, a notice that the contents are sterile, and tamper-evident seals on the top and bottom flaps. The professional solutions, for which plaintiff does not seek premarket FDA approval, do not include such information on their outer packaging, but bear a message to "see package insert for directions and important safety information." (Def.Ex. 8). One type of the professional solutions, the Advance Starter Kit, does not include a tamper-evident seal. Labels which say "Not for Sale," "For Dispensing by An Eye Care Professional Only or for Professional Dispensing Only" are affixed to most of the professional solutions. The parties differ as to exactly what information is required by the FDA to appear on the exterior packaging of the retail products. Plaintiff asserts that the FDA requires, *inter alia*, a list of active ingredients and preservatives. *See* 21 U.S.C. § 321(k), (n) (1988).[1] Defendant contends that the inclusion of all of the above-mentioned information in package inserts and on the bottles of professional solutions is sufficient for compliance with the regulations, *see* 21 C.F.R. §§ 801.1; 800.12(a) and (c); and 801.62.

A subsection of the pertinent regulations, entitled "Meaning of 'Intended Uses,'" includes the following language (21 C.F.R. § 801.4, emphasis supplied):

---

1. Prior to 1992, plaintiff sold retail a product called the "Convenience Pack" which concededly did not include the information which it now deems required by the FDA. The Convenience Pack had been approved by the FDA prior to its introduction into the retail market. Thus during the course of this litigation, plaintiff discovered that it was selling an FDA-approved product in the retail market which bore less information on its label than was found on the Professional Solutions, the retail sale of which it claims violates FDA requirements. Since May of 1992 plaintiff has included all of the information it contends is required by the FDA on the exterior packaging of the Convenience Pack.

The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the devices, the packer, distributor or seller is required to supply adequate labelling in accordance with the new intended uses. *But if manufacturer knows, or has knowledge of facts that would give him notice that a device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a device which accords with such other uses to which the article is to be put.*

## B. Limitations Which Plaintiff Placed on the Sale of the Professional Samples

Plaintiff distributes its professional samples through selected distributors, all of whom have entered into essentially the same contract with it. This contract contains no explicit restriction on the resale of the solutions (Pl.Mem. at 9, 44, 55; Pl.Exh. K). It does, however, contain an explicit restriction on the resale of contact lens, entitled "Limitations on Resale or Transfer" which states in pertinent part (Pl.Exh. K, Schedule A, ¶ F):

> As a condition to the continued authorization of [distributor] hereunder ... [distributor] agrees not to sell or transfer without the written approval from Polymer Technology Corporation ... the Boston Lens Contact Lens materials to any manufacturing lens laboratory, or lens distributor or reseller, that is not currently an authorized manufacturer and distributor of The BOSTON LENS Contact Lens, and acknowledges that any such resale is in contravention with this Agreement ... Any transfer ... in violation of this provision shall result in the immediate termination of this Agreement by PTC, and the [distributor] shall be liable to PTC for any and all damages resulting from any such transfer.

The record includes the following evidence suggesting that plaintiff was aware that its distributors were selling professional solu-

tions to "non-professional" accounts. A document entitled "Promotional Money/Prize Point Record Form" (Def.Exh. 6) which describes the terms of an incentive plan designed to encourage plaintiff's distributors to promote its products, contains a warning that "P.M.'s/Prize Points are not paid on purchases by nondispensing or nonpractitioner accounts." Thus, far from threatening reprisals for sales by distributors to nonpractitioners, the document merely announced that no bonus would be awarded for such sales. Moreover, four memoranda from plaintiff urging its distributors to cease offering the professional samples for ultimate retail sales include the following admonishments:

> Some non-BOSTON distributors have been tempted to ... bu[y] Care Systems from BOSTON labs and sel[l] them to retail drug stores. Every time this happens, it creates pressure to raise Care Systems prices, and it reduces sales and retail commissions significantly ... To further clarify this issue, no promotional monies are paid on sales to nonpractitioner accounts. (Pl.Ex. 11, Nov. 1988 Mem.)

> [W]e intend to take immediate action against retailers who are found to be selling any product intended for the practitioner. (1) These retailers will no longer be able to buy Boston products on a direct basis for a minimum of 2 years. (2) We will specifically exclude the offending retailers from the product liability coverage we provide for all Boston products ... (3) We will use package numbers to track down the retailers' suppliers of practitioner product and cease to do business with them. (April 1989 Mem.)

> The redistribution of BOSTON Solutions and Care Systems to the retail trade has become a rapidly increasing problem for PTC ... [W]e are instituting several measures that should help put a stop to this diversion problem ... This product will be tamper-evident via a safety seal on the neck of each bottle. These seals will state that the product is "For Professional Use Only." (May 1989 Mem.)

> Unfortunately, there continue to be instances where practitioners product is be-

ing sold by several mass market retailers. (March 1990 Mem.)

Significantly, nowhere in the threats made against its distributors does plaintiff suggest the possibility of bringing against any of them legal action for violation of contract.

## C. The Court of Appeals' Majority Opinion

■ The majority opinion did not reach the merits, but vacated the denial of the preliminary injunction and remanded for further consideration of evidence relating to three of plaintiff's theories of liability—quality control, unauthorized distribution and contributory infringement. As to quality control, it directed reconsideration of the following evidence: 1) the declarations and deposition testimony of two private investigators who claimed to have observed one of defendant's employees breaking down and separating professional kits; 2) invoices showing sales of individual solutions to a retail outlet called Vision Express, of which defendant is a 50% owner; and 3) a photograph of a garbage can outside defendant's warehouse which held discarded packaging from plaintiff's competitors' solutions, 975 F.2d at 62–63. As to the unauthorized distribution claim, the majority directed us to consider whether, despite plaintiff's failure to have contractually restricted retail sale of its professional solutions, it was entitled to a preliminary injunction due to its expression of intent so to restrict sales by labelling its products "For Professional Use Only." *Id.* at 64. Finally, it directed us to reconsider the evidence of contributory infringement, suggesting that the restrictive labelling provided defendant with notice that the professional solutions would have to be repackaged in order to be sold at retail. *Ibid.*[2]

In a dissenting opinion, Judge Kearse, while recognizing that "it would have been more helpful if the findings of the district court had been more explicit and complete," did proceed to the merits. She concluded that it could not be said that we had abused our discretion in denying plaintiff's motion

for a preliminary injunction, at 65. She noted that plaintiff's various expressions of its unilateral intent to limit sales of the professional solution did not take the place of a contractual restriction, *ibid.*, and that plaintiff's evidence of tampering was not convincing, at 65–67.

## DISCUSSION

Plaintiff, represented by a new attorney, focuses its renewed motion upon several new theories of liability: unfair competition by misappropriation; unjust enrichment; and tortious interference with contract. Before addressing these new claims, we shall discuss the evidence the majority has directed us to consider, relating to the three theories of liability upon which plaintiff relied in its initial motion for a preliminary injunction.

## A. Quality Control

■ Two of plaintiff's investigators, Stephen J. Petro and Steven Iken, testified in depositions regarding a visit they made in an undercover capacity to defendant's warehouse on September 11, 1991. Each testified that he there had seen a woman unpacking shipping cartons containing what appeared to be plaintiff's products and sorting out the contents on a large table. (Def.Exh. 16, Petro Dep. p. 58; Def.Exh. 17, Iken Dep. pp. 72–73). Iken also testified that he had searched through garbage outside of defendant's warehouse and home six to ten times, but that he had failed to find any evidence of repackaging of plaintiff's products (Def.Exh. 17, Iken Dep. pp. 105–107). Defendant and Judge Kearse have pointed out inconsistencies between the investigators' deposition testimony and statements they made in various declarations and reports (Def.Br. pp. 28–31, 975 F.2d at 66). While those criticisms are clearly valid, we are ultimately persuaded to reject the investigators' evidence because they failed, either by means of making an undercover purchase, or by their six to ten "garbage pulls," to obtain a shred of physical

---

2. The majority opinion also raised the question of whether our stated intention to award damages to defendant from the injunction bond was premature. 975 F.2d at 64–65. Our reason for so stating was that we had found that plaintiff

had produced no evidence to support its allegations. The majority opinion has led us to conclude that this finding was unnecessarily sweeping, and that an award of damages would be inappropriate.

evidence which could be said to establish tampering or repackaging. As to the photograph of a garbage can containing discarded packaging from some of plaintiff's competitors, we conclude that while this might indicate malfeasance in defendant's dealing with those manufacturers, nothing in the photograph suggests anything with respect to plaintiff's product. Finally, the invoices showing sales of individual solutions to Vision Express, apparently represent sales of unopened boxes containing twelve bottles of solution packaged precisely in the manner in which they were sold by plaintiff (Def.Ex. 10, Def.Ex. 7 ¶¶ 18 and 26), which does not suggest either tampering or repackaging. Thus we again conclude that plaintiff has "produced no credible or sufficiently probative evidence to support its claim" of tampering or repackaging.

■ Having concluded that it has not been established that defendant disassembled plaintiff's product, we turn to the question of whether defendant's sale to retail outlets of products which plaintiff claims were not in compliance with FDA regulations constituted a violation of plaintiff's "right to control the quality of goods manufactured and sold under the holder's trademark." In the first place, we note that plaintiff's claim that the professional solutions are not adequately labelled for retail sale seems to be belied by the fact that the Combination Pack, which concededly bore less information than the Professional Solutions, received FDA approval and was placed by plaintiff into the retail market. In addition, we find that this question seems to be disposed of by the above-mentioned section of the pertinent FDA regulations, 21 C.F.R. § 801.4, which requires that if a manufacturer knows that "a device introduced into interstate commerce by him is to be used for conditions purposes or uses other than the ones for which he offers it, he is required to provide adequate labeling for such device which accords with such other uses to which the article is to be put." Finally, as the memoranda from plaintiff to its distributors, *supra*, make clear, plaintiff had for a long time been well aware that its professional products were being used for retail sales, a different purpose than the one for which it had been introduced into inter-

state commerce. Plaintiff's threat to "exclude the offending retailers from the product liability coverage we provide for all Boston products" (Pl.Exh. 11, Apr.1989 Mem.) underscores the fact that it had considered the worst possible consequences of this unintended use and took no legal action to stop it until the initiation of this lawsuit in December of 1991.

**B. Unauthorized Distribution**

■ The majority directed us to consider whether or not plaintiff's clear expression of its intent to restrict sales of the professional solutions by way of the above-mentioned restrictive labelling made defendant liable for trademark infringement due to unauthorized distribution. 975 F.2d at 64. Having so considered, we conclude that it did not. The majority did not cite, nor has our research found, a single Second Circuit case in which trademark infringement was said to have been established in a situation where a plaintiff, when drafting a contract with its distributors, had not taken the trouble to proscribe the conduct which it later contended was in violation of such contract. *Compare, e.g. El Greco Leather Products Co. v. Shoe World, Inc.* (2d Cir.1986) 806 F.2d 392, cert. denied, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987) (trademark infringement found where defendant violated contractual provision specifically barring any sale of product absent inspection); *Original Appalachian Artworks v. Granada Electronics* (2d Cir.) 816 F.2d 68, *cert. denied,* 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987) (trademark infringement found where defendant violated contractual restriction limiting territory within which product could be sold).

We note that the 6th Circuit found unfair competition in a case with facts analogous to the one before us, *Clairol, Inc. v. Boston Discount Ctr., Inc.* (6th Cir.1979) 608 F.2d 1114, 1120 (retail sale of salon products which omitted certain instructions and labelling constituted unfair competition), as some other courts faced with similar facts have done, *see Clairol, Inc. v. Carlton Drug, Inc.* (1st Dep't.1967) 27 A.D.2d 652, 278 N.Y.S.2d 177; *Clairol, Inc. v. Cosmetics Plus* (1974) 130 N.J.Super. 81, 325 A.2d 505. However, we

find more convincing the reasoning of the Supreme Judicial Court of Massachusetts in *Clairol, Inc. v. Cody's Cosmetics, Inc.* (1967) 353 Mass. 385, 231 N.E.2d 912. In that case, the court refused to grant injunctive relief prohibiting defendant retail drug store from selling "professional use" bottles, stating its reasons as follows (emphasis added):

> Clairol presses upon us the potential risks to its business reputation from uninstructed home use of its "Professional Use Only" product ... Clairol, it seems to us, largely seeks to protect what has been an effective marketing and advertising devise ..." 353 Mass. at 393, 231 N.E.2d at 917.

> we see no basis for treating ... Clairols labels on its "Professional Use" bottles ... as binding in equity upon non-professional purchasers ... *who have no direct contractual relationship with Clairol.* 353 Mass. at 394, 231 N.E.2d at 918.

### C. Contributory Infringement

■ The majority suggested that we view with skepticism defendant's denial that it knew that the admitted counterfeiter Worldwide Scents, to whom it was selling plaintiff's products, was repackaging the professional solutions. It noted that "it would not have taken a great leap of imagination for Mimran to realize that, *given their labelling,* the professional kits would have to be repackaged before they could be sold at retail," at 64, (emphasis added). The quoted statement was obviously based upon the assumption that it would, as a practical matter, have been impossible to resell the restrictively labelled products at retail without repackaging them. However, nothing in the record establishes such to be the case. On the contrary, much suggests that the opposite is true. For example, in its memorandum in support of the present motion plaintiff contends that the appearance on retail store shelves of precisely such unrepackaged products bearing labelling such as "For Professional Use Only" causes consumer confusion and damages its good will (Pl.Mem. at 26, 57). In brief, finding no evidence to rebut

defendant's denial of knowledge regarding Worldwide Scents' counterfeiting of plaintiff's trademark, we see no reason to reject such denial.

### D. The Misappropriation Theories

■ Subsequent to the Court of Appeals decision, plaintiff amended its complaint to assert new theories of liability, all of which are premised on the claim that defendant misappropriated plaintiff's professional solutions. Those theories are: (1) unfair competition by misappropriation; (2) unjust enrichment; and (3) tortious interference with contract. We note at the outset that we find unconvincing plaintiff's argument that its contract with its distributors requires the implication of a restriction on sales of the professional solutions to the retail market. As discussed above, plaintiff appears to have been perfectly capable of drafting an explicit restriction against unauthorized resale and distribution of its products when it intended so to do. *See* "Limitations on Resale and Transfer" (Pl.Exh. K, Schedule A, ¶ F).

### 1. Tortious Interference With Contract

■ Having rejected plaintiff's contract interpretation, we must also reject its claim of tortious interference with contract, as such a claim requires plaintiff to show: "(1) the existence of a valid contract between itself and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional procurement of a breach of that contract by the third party; and (4) damages." *L.G.B. Inc. v. Gitano Group, Inc.* (1991 S.D.N.Y.) 769 F.Supp. 1243, 1254. While the parties agree that the contract between plaintiff and its distributors is valid, our conclusion that it has no bearing on the sale of professional solutions to the retail market leads us to conclude that defendant has not tortiously interfered with such contract.[3]

### 2. Unfair Competition and Unjust Enrichment

■ Plaintiff's assertion that defendant misappropriated its product is similarly una-

---

**3.** We also note that in the cases cited by plaintiff in support of its claim of tortious interference with contract, the plaintiff and a third party were bound by a valid contract which explicitly covered the conduct in dispute. *See Am. Airlines v. Christensen* (10th Cir.1992) 967 F.2d 410; *Avon Prods. Inc. v. Berson* (1954 Sup.Ct., N.Y.Co.1954) 206 Misc. 900, 906, 135 N.Y.S.2d 867.

vailing. Its vivid portrayal of defendant as a lawless figure who "ranged the country searching for distributors who would accept his pose of affiliation with a doctor" (Pl.Mem. at 15), is not supported by evidence which persuades us to grant a preliminary injunction. The evidence on this point consists of a set of affidavits by distributors who had sold plaintiff's product to defendant, and an affidavit by the defendant (Pl.Exh. F, Gartke Tr. 18, 29, 52, 108; Pl.Exh. D, Slanksy Aff. ¶¶ 6 and 7, Pl.Exh. B, Bailey Aff. ¶ 5; Pl.Exh. C, Barnes Aff. ¶¶ 3–4; Def.Exh. 7, Supp.Mimran Decl. II, ¶ 37). Not surprisingly, each of these affidavits paints a glowing picture of the rectitude of the affiant. If this were a motion for summary judgment on defendant's behalf we might well conclude that the affidavits submitted by plaintiff presented a question of fact which could not be resolved on such a motion. However, by no stretch of the imagination are we persuaded that plaintiff has born the burden of establishing that it has a likelihood of success on the merits.

## CONCLUSION

For the foregoing reasons, plaintiff's renewed motion for a preliminary injunction is denied.

SO ORDERED.