37 F.3d 74
 32 U.S.P.Q.2d 1506
 POLYMER TECHNOLOGY CORPORATION (a New York Corporation),
Plaintiff-Appellant,
v.
Emile MIMRAN, also known as Alan Franco; U.D.S. Export &
Import, also known as User Designed Software; Optic
Express, Incorporated; American Contact Lens Association;
International Contact Lens Lab I; Marty Powers Sales,
Incorporated; Worldwide Scents, Incorporated; Julio
Moreno; Carlo Sanchez d/b/a Alpha Omega; and Various John
Does, Jane Does and XYZ Companies, Defendants-Appellees.
 No. 1979, Docket 94-7207.
 United States Court of Appeals,
Second Circuit.
 Argued May 23, 1994.
Decided Oct. 6, 1994.
 
 Morton M. Maneker, New York City (Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for plaintiff-appellant.
 Fran M. Jacobs, New York City (Jonathan A. Kenter, Richards & O'Neill, New York City, of counsel), for defendants-appellees.
 Before: VAN GRAAFEILAND, CARDAMONE, and ALTIMARI, Circuit Judges.
 ALTIMARI, Circuit Judge:
 
 
 1
 This action for a preliminary injunction returns to us after a prior remand to the district court. See Polymer Technology Corp. v. Mimran, 975 F.2d 58 (2d Cir.1992) ("Polymer I "). In 1991, plaintiff-appellant Polymer Technology Corporation ("Polymer") commenced an action against defendant-appellee Emile Mimran and other defendants alleging various claims of trademark infringement and counterfeiting. The claims were based on the defendants' retail sales of a promotional product manufactured by Polymer that Polymer claimed was intended for professional distribution only. All defendants other than Mimran stipulated to a preliminary injunction. The district court denied the injunction against Mimran, finding insufficient evidence of counterfeiting or trademark infringement. On appeal, we remanded for further findings regarding certain of Polymer's claims. For the reasons discussed below, we now affirm the district court's denial of the preliminary injunction, 841 F.Supp. 523.BACKGROUND
 
 
 2
 Polymer, a manufacturer of ophthalmic products including contact lens solutions, sells its lens care solutions under the federally-registered "BOSTON" trademark. Polymer uses two methods of distributing these solutions. One line of solutions is distributed in the retail market ("retail solutions"). The retail solutions are generally packaged individually and their outer packaging contains a list of active ingredients and preservatives, a notice that the contents are sterile, warnings concerning contamination, contraindications, and shelf life, and tamper-evident seals on the top and bottom flaps. The solutions also contain an insert with directions and important safety information.
 
 
 3
 The other line of solutions is directed through authorized distributors to professional eye-care practitioners ("professional solutions"). Although the professional solutions contain an insert similar to the one used with the retail solutions, they do not always contain the same information on their outer packaging as the retail solutions, nor do they always contain the tamper-evident seal. Some of the solutions contain labels indicating that the solutions are "For Professional Dispensing Only."
 
 
 4
 The professional solutions are packaged in two types of kits, "Care System Kits" and "Starter Kits." The "Care System Kits" contain a full retail-size bottle of conditioning solution, and smaller containers of lens cleaner and reconditioning drops. Polymer sells these Care System Kits to the distributors for $1.75, and they in turn sell them to eye-care professionals for between $2.00 and $2.50. The price for the retail equivalent of the "Care System Kits" ranges from $10.00 to $14.50. The "Starter Kits" contain sample-sized containers of the solutions and are given to the distributors free of charge.
 
 
 5
 Although Polymer's authorized distributors are not explicitly contractually bound to restrict their distribution of the professional solutions to eye-care practitioners, the distribution of the professional solutions to these practitioners is a key part of Polymer's marketing strategy. Presumably the eye-care practitioners give the solutions to their patients as they fit them for contact lenses, and the patients then continue to use the BOSTON solutions in the future. Polymer's marketing research indicates that 75-80% of patients will continue to buy the same brand of solution recommended to them by their doctors.
 
 
 6
 Defendant-appellant Emile Mimran owns a number of businesses that distribute ophthalmic lens care products. Mimran admittedly obtains Polymer's professional solutions from Polymer's authorized distributors and then resells them to wholesalers and retail drug stores. Polymer sought a preliminary injunction against Mimran from obtaining possession of, purchasing, or selling Polymer's professional solutions. The district court for the Southern District of New York (Knapp, J.) denied the injunction against Mimran, finding, among other things, that Polymer's failure to have restricted by contract "the population of entities to which defendants could sell its product" defeated Polymer's claim that the sales in question were unauthorized. On appeal, a divided panel of this Court vacated the district court's decision and remanded for reconsideration of certain evidence relevant to Polymer's claims of trademark infringement. See Polymer I, 975 F.2d at 61. Polymer then made a renewed motion for a preliminary injunction based upon the trademark theories previously advanced as well as several new theories. On remand, the district court reconsidered the evidence, considered Polymer's new theories, and again denied the motion.
 
 
 7
 Polymer now appeals.
 
 DISCUSSION
 
 8
 On appeal, Polymer maintains that Mimran's retail sale of products Polymer intended only for professional distribution constitutes trademark infringement and common law misappropriation. We will discuss each of Polymer's theories of liability in turn.
 
 I. Standard of Review
 
 9
 As a general matter, in order for Polymer to obtain a preliminary injunction, it must demonstrate irreparable harm, and "either (1) a likelihood of success on the merits of its case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor." Coca-Cola Co. v. Tropicana Prods., Inc., 690 F.2d 312, 314-15 (2d Cir.1982) (citations omitted). A decision to grant or deny a preliminary injunction is committed to the discretion of the district court. See id. at 315.
 
 II. Trademark Infringement Claims
 
 10
 As it did below, Polymer sets forth the following three theories of trademark infringement by Mimran: quality control violations, unauthorized distribution, and contributory infringement.
 
 
 11
 (1) Quality Control
 
 
 12
 An action for trademark infringement arises where "[a]ny person ... without the consent of the registrant ... use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods ... [and] such use is likely to cause confusion...." Section 32(1) of the Lanham Act, 15 U.S.C. Sec. 1114(1). An action will not arise where the goods being sold are genuine goods bearing a true mark. See Polymer I, 975 F.2d at 61 (citation omitted). Goods, however, that do not meet the trademark owner's quality control standards will not be considered genuine goods, and their sale will constitute trademark infringement. See, e.g., El Greco Leather Prods. Co. v. Shoe World, Inc., 806 F.2d 392, 395-96 (2d Cir.1986) (finding trademark infringement where defendants sold plaintiff's shoes even though the shoes had not been inspected by plaintiff, where inspection was integral part of plaintiff's quality control effort); Shell Oil Co. v. Commercial Petroleum, Inc., 928 F.2d 104, 107 (4th Cir.1991). This is so because "trademark law ... serves to guarantee the quality of the trademarked product," Original Appalachian Artworks, Inc., v. Granada Elecs., Inc., 816 F.2d 68, 75 (2d Cir.1987) (Cardamone, J., concurring), cert. denied, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1987), and the sale of inferior goods with a true mark will clearly undermine the value of the trademarked brand as a guarantor of quality.
 
 
 13
 Relying on the above case law, Polymer claims that Mimran has violated its trademark rights by selling its professional solutions to the retail market even though the solutions do not meet Polymer's quality control standards for retail product. Specifically, Polymer claims that the kits being sold by Mimran do not meet its quality control standards for retail product because the kits lack ingredients statements, warnings, and anti-tampering seals required by the FDA. Additionally, Polymer claims that Mimran breaks down the kits and sells the solutions individually, without the appropriate individual packaging.
 
 
 14
 (a) improper labeling
 
 
 15
 In its initial decision, the district court did not address Polymer's claims that Mimran's distribution of allegedly mislabeled product amounted to trademark infringement. In Polymer I, we directed the court to consider whether these FDA labeling violations occurred and whether such violations can constitute trademark infringement. On remand, the district court found that Polymer's claims were belied by the fact that Polymer itself placed a product (the "Combination Pack") into the retail market that did not contain the information that Polymer now claims must be on all retail products.
 
 
 16
 After carefully reviewing Polymer's arguments and the relevant sections of the FDA regulations, we are unpersuaded that the retail sale of the solutions by Mimran violates FDA labeling requirements. Alternatively, even assuming that the retail sale of the solutions by Mimran violates FDA regulations, we do not find such sale a violation of Polymer's own quality control standards.
 
 
 17
 Regarding the FDA requirements, although Polymer argues that a medical device will be deemed "misbranded" unless it contains certain information that the labels of the professional solutions lack, the statute actually requires that such information appear on the "labeling." See 21 U.S.C. Sec. 352(f). Labeling is defined as the information on the outer packaging and any information included separately. See 21 U.S.C. Sec. 321(m). Accordingly, because the required information appears on the insert included with the kits, we are not convinced that the retail packaging violates the FDA regulations.
 
 
 18
 In any event, as noted by the district court, Polymer itself introduced a product in the retail market containing an outside label with less information than that included on the outside labels on the professional kits. On appeal, Polymer claims that the product's labeling was a mistake. This claim is equally damaging to Polymer's quality control argument. Whether or not the FDA regulations have been violated, in order to succeed with its claim of quality control trademark infringement, Polymer must ultimately prove that any actions taken by Mimran violated the quality control procedures followed by Polymer. See, e.g., El Greco, 806 F.2d at 395 ("[A]ctual quality of the goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain.") (citation omitted). Because Polymer essentially admits that it did not carefully police any procedures it may have had in place to ensure that the necessary information appeared on Polymer's packaging, we do not find Mimran's retail distribution of the professional kits, even if violative of FDA regulations, a violation of Polymer's own quality control standards. See, e.g., Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., 988 F.2d 587 (5th Cir.1993) (rejecting quality control trademark infringement claim because of plaintiff's failure to monitor its alleged quality control requirements).
 
 
 19
 (b) tamper-evident seals
 
 
 20
 Polymer next claims that the retail distribution of its product without FDA-required tamper-evident seals interfered with its quality control. The district court did not discuss this argument. The FDA requirements clearly provide that seals are required when the "product is accessible to the public while held for sale." 21 C.F.R. 800.12(b) (1994). Assuming that Mimran did distribute some Polymer product without tamper-evident seals, there is no evidence that Polymer had any quality control mechanism in place to prevent its authorized distributors from placing professional samples lacking tamper-evident seals in places that were not "accessible to the public while held for sale." For example, some of the eye-care professionals to whom BOSTON Kits are distributed are optical retail stores, and Polymer does nothing to ensure that those stores keep the kits inaccessible from the public. Accordingly, because Polymer itself has no procedures in place to prevent its non-sealed kits from reaching the retail public, it cannot now claim that its trademark was violated because Mimran allowed such product to reach that market.
 
 
 21
 (c) tampering or repackaging
 
 
 22
 Polymer's final claim regarding quality control is based on its allegation that Mimran breaks up the kits and sells the solutions individually. Polymer claims that the selling of the individual solutions without the customary individual outer packaging disappoints the expectations of customers and disturbs their confidence in Polymer's products. The district court originally found that there was no evidence that Mimran broke the tamper-resistant seal, or in any way altered the packaging. We directed reconsideration of certain evidence regarding this claim. Specifically, we ordered the district court to consider: (1) the declarations and deposition testimony of two private investigators who claimed to have observed one of Mimran's employees breaking down and separating professional kits; (2) invoices showing sales of individual solutions by Mimran to a retail outlet called Vision Express; and (3) photographs of a garbage can outside Mimran's warehouse which held discarded packaging from Polymer's competitors' solutions.
 
 
 23
 On remand, the district court considered all of the above evidence and still concluded that there was insufficient evidence to support Polymer's claim that Mimran had broken down the kits and sold the solutions individually. Regarding the statements made by the two private investigators, the court found their testimony incredible due to certain inconsistencies. For example, although one of Polymer's investigators testified that he had witnessed one of Mimran's employees breaking down the kits, his previous declaration in support of Polymer's motion contained no mention of this incident. The court also found telling the investigator's failure to obtain any physical evidence of repackaging, such as an individual bottle sold separately from its kit, or any pictures of Polymer's packaging in the garbage cans that Polymer had searched. We find these factors clearly support the district court's denial of this claim.
 
 
 24
 In sum, Polymer has failed to prove that the district court abused its discretion in failing to accept Polymer's theory of trademark infringement based on Mimran's alleged circumvention of Polymer's quality control efforts.
 
 
 25
 (2) Unauthorized Distribution
 
 
 26
 Polymer next claims that the retail distribution of its professional product constituted trademark infringement under a theory of unauthorized distribution. The district court originally disregarded this theory of liability because it found no contractual provision preventing retail sale of the professional solutions, nor did it find any indication that Mimran had notice of Polymer's intent to restrict resale to eye-care professionals. This Court directed the district court to reconsider whether, despite Polymer's failure to have contractually restricted retail sale of its professional solutions, it was entitled to a preliminary injunction due to its expression of intent so to restrict sales by labeling its product "For Professional Dispensing Only." On remand, the district court considered the issue and concluded that intent alone, in the absence of a contractual provision, does not suffice to make Mimran liable for trademark infringement due to unauthorized distribution.
 
 
 27
 Regardless of the presence or absence of a contractual restriction, a distributor's failure to observe a restrictive condition on the sale of a product can only constitute trademark infringement if the trademark owner can prove consumer confusion, the hallmark of any trademark infringement claim. See Polymer I, 975 F.2d at 63 (citations omitted). Polymer offers two theories of consumer confusion to support its claim of unauthorized distribution. We find both equally unpersuasive.
 
 
 28
 First, Polymer claims that the sale of a product in the retail market which is specifically marked "For Professional Distribution Only" will cause consumer confusion about the "legality and safety of the product." This is not the type of consumer confusion that courts have previously found gives rise to a claim for trademark infringement in these types of cases. Generally, courts find consumer confusion only where consumers, relying on the reputation of a trademark, buy a product that they think is safe or of a certain quality, and then subsequently find out that they have actually purchased an inferior item. See Matrix Essentials, 988 F.2d at 591 (concluding consumer confusion necessarily involves "some defect (or potential defect) in the product itself that the customer would not be readily able to detect"); see, e.g., El Greco, 806 F.2d at 395-96 (finding consumer confusion where retailer distributed shoe that did not meet the quality control standards of the CANDIES brand of shoes yet still contained the CANDIES stamp). Because consumers will attribute the inferior good to the trademark owner, the reputation of the trademark will be harmed. In contrast, in this case, consumers buying the product are informed from the outset that the product is "For Professional Dispensing Only." Accordingly, although consumers may wonder why they are able to buy a product that is labeled "For Professional Distribution Only" in a retail store, they are certainly not being deceived about what they are receiving. See, e.g., Matrix Essentials, 988 F.2d at 591 (no trademark infringement where consumers made retail purchases of plaintiff's hair care products labeled for salon use only because consumers obviously not deceived about whether they were getting a cosmetologist's consultation with their purchase); H.L. Hayden Co. of New York v. Siemens Medical Systems, Inc., 879 F.2d 1005, 1023 (2d Cir.1989).
 
 
 29
 Perhaps realizing the flaws in its first theory of consumer confusion, Polymer also directs us to its discussion of consumer confusion under its theory of quality control violations. There, Polymer argues that Mimran was placing a product on the shelves that did not meet Polymer's standards, and consumers would mistakenly believe that Polymer was the source of the inferior product. Although this is clearly a correct theory of consumer confusion, as discussed above, given Polymer's failure to monitor its alleged quality control standards, we are not convinced that the product sold to wholesalers and retailers by Mimran was inferior to the product distributed by Polymer.
 
 
 30
 Ultimately, Polymer has failed to offer any support for the proposition that the unauthorized sale of genuine products will constitute trademark infringement merely because the goods contain a label indicating that the goods were meant to be sold in a market other than the one they appear in.
 
 
 31
 (3) Contributory Infringement
 
 
 32
 Polymer's final trademark infringement claim relates to the conduct of Worldwide Scents, Inc., one of the defendants named in the original suit and Mimran's largest purchaser, which admitted breaking down the professional kits and selling them at retail with counterfeit packaging. Polymer claims that Mimran contributed to Worldwide's infringement by knowingly selling to an admitted counterfeiter. The district court had initially rejected this claim after Mimran denied knowing of Worldwide's counterfeiting. In Polymer I, we were skeptical of Mimran's denial of knowledge that Worldwide was repackaging the professional solutions. We directed the district court to reconsider the possibility that the restrictive labeling provided Mimran with notice that the professional solutions would have been repackaged in order to be sold at retail.
 
 
 33
 Upon reconsideration, the district court concluded that because Mimran himself was able to sell product with restrictive labeling to retailers, there was no reason for him to conclude that Worldwide must have been breaking down the packages in order to sell them. Because of this valid interpretation of the record, and evidence that the president of Worldwide denied that Mimran had knowledge of his counterfeiting activities, we now find that the court's rejection of this claim was not an abuse of discretion.
 
 II. Common Law Misappropriation Claims
 
 34
 Upon Polymer's renewal of its motion for a preliminary injunction, Polymer amended its complaint to assert the following new theories of liability: (1) unfair competition by misappropriation; (2) unjust enrichment; and (3) tortious interference with contract. All these claims are based on the contractual or implied restriction Polymer claims it placed on its distributors not to sell its professional solution to retailers. Polymer essentially alleges that Mimran, with knowledge of this restriction, fraudulently induced Polymer's lab distributors to supply him with quantities of professional samples which he then sold in the retail market.
 
 
 35
 Polymer seems to admit that there is no clear contractual provision limiting distribution of the professional solutions, but urges that the contract should nonetheless be interpreted as implying a restriction on sales of the professional solution to the retail market. In support of this interpretation, Polymer relies on the contractual obligation of the lab distributors "to promote The BOSTON Solution products."
 
 
 36
 Interestingly, the paragraph describing the distributors' responsibility to promote the BOSTON Solutions makes no mention of promotional kits. Furthermore, the contract does contain an explicit limit on the resale and transfer of other BOSTON products. Accordingly, we are skeptical of Polymer's interpretation of the contract. In any event, however, we find the cases cited by Polymer in support of its misappropriation theories wholly distinguishable.
 
 
 37
 In American Airlines v. Christensen, 967 F.2d 410 (10th Cir.1992), the case relied on by Polymer to support its theory of unfair competition, the court enjoined a brokerage firm from purchasing frequent flyer travel awards from customers and reselling them to third parties. The promotional program at issue permitted members to accumulate miles by taking American flights and then trading the miles for travel awards. To obtain the awards, members had to fill out application forms on which they were required to agree that they would not sell, barter, or exchange the awards. Both the applications and the awards clearly stated that the awards would have been void if they were sold, bartered, or exchanged for consideration.
 
 
 38
 Defendants in that case bought awards from members and sold them to third parties who were looking for discount fares. Defendants then helped the third parties evade detection by altering their airline tickets, manufacturing false identification cards for them, and instructing them to lie about how they acquired their tickets. No comparable claims can be made in this case. Aside from the absence of an explicit contractual restriction on the distributor's retail sale of the professional solutions, there is evidence in the record that authorized distributors willingly sold the product to Mimran without receiving assurances that the product would not be diverted to the retail market. Accordingly, Mimran's behavior cannot be compared to that of the defendant in American Airlines who knowingly, in contradiction of a clear contractual restriction between American and its frequent flyer customers, helped third parties surreptitiously buy awards and evade detection by the airline.
 
 
 39
 The above distinctions are equally applicable to Northwest Airlines, Inc. v. The Ticket Exchange, Inc., 793 F.Supp. 976 (W.D.Wash.1992), the case relied on by Polymer to support its claim of unjust enrichment. There, defendant, also a broker of frequent flyer tickets in contravention of an airline's contract with its passengers, knew of the airline's explicit contract with its flyers and counseled its customers in subterfuge.
 
 
 40
 Finally, regarding Polymer's claim of tortious interference with contract, Polymer has presented no cases supporting application of the cause of action where there is no specific contractual provision barring the behavior at issue.
 
 
 41
 Aside from the above flaws in Polymer's new theories of liability, because Polymer could be adequately compensated with money damages if it were to prevail on these claims at trial, Polymer has also failed to convince us that it has suffered irreparable injury. See Loveridge v. Pendleton Woolen Mills, Inc., 788 F.2d 914, 918 (2d Cir.1986) (noting that where money damages are available, there is no irreparable injury, and preliminary injunctive relief must be denied). Given its ability to calculate the number of kits Mimran bought by looking at either Mimran's records, or the records of Polymer's authorized dealers, Polymer's money damages are not indeterminate. Based on the foregoing, we do not find that the district court abused its discretion in denying Polymer's motion for a preliminary injunction.
 
 CONCLUSION
 
 42
 The judgment of the district court denying Polymer's motion for a preliminary injunction is affirmed.